[No. H002265. Sixth Dist. Nov. 9, 1989.]

CLAUDE FLETCHER, Plaintiff and Appellant, v.
SAN JOSE MERCURY NEWS et al., Defendants and Respondents.

## COUNSEL

Harry J. Delizonna and Tim Provis for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan, Edward P. Davis, Jr., Kevin M. Fong and Joseph A. Hearst for Defendants and Respondents.

## OPINION

ELIA, J.—This is an action for libel and slander brought by appellant Claude Fletcher, a former San Jose City councilman, against respondents San Jose Mercury News, Knight-Ridder Publications and Mercury News reporter Scott Herhold.

The libel claim arose after the Mercury News published a series of articles reporting on Fletcher's conduct as a member of the board of economic and social opportunities (ESO), a local antipoverty agency. The slander cause of action resulted from allegations that Herhold described Fletcher as a "crook" and a "crooked politician."

Respondents' motion for nonsuit was granted as to the slander cause of action. A jury trial on the libel claim resulted in a verdict for Fletcher. He was awarded $250,000 in general damages, $25,000 in special damages, and punitive damages totalling $735,000.

Respondents' motion for judgment notwithstanding the verdict was granted by the trial court on the ground that there was no clear and convincing evidence that the articles were published with actual malice.

Respondents' motion for a new trial was also granted on the basis that the verdict was against the weight of evidence and because of error in the giving of certain jury instructions.

Fletcher appeals the granting of the motions for nonsuit, judgment notwithstanding the verdict, and new trial. ■■ ■ ■ We affirm.[1]

### FACTS AND PROCEDURAL BACKGROUND

Shortly after his election to the San Jose City Council in 1980, Fletcher was appointed by San Jose Mayor Janet Gray Hayes to the board of ESO. ESO is a nonprofit agency established to help low income residents of Santa Clara Valley obtain funding from local, state and federal authorities.

In early 1983, ESO had an opportunity to sponsor a program which would provide weatherization for the homes of low income persons. At a January 24, 1983, ESO board meeting, the ESO board members, including Fletcher, discussed whether the weatherization work should be completed in-house or contracted out to private companies. Fletcher volunteered to research companies which might be suitable for the project. The board asked Fletcher to report on this research in two weeks.

As part of his research, Fletcher contacted a business called Weathermaster. Fletcher was familiar with Weathermaster and the company's sales manager, Archie Westfall, because Fletcher had worked for Weathermaster in the late 1950's. Fletcher spoke with Westfall about the ESO weatherization program and ultimately concluded Weathermaster should be awarded the project. During his conversations with Westfall, Fletcher learned that Westfall was considering buying out Weathermaster.

Shortly thereafter, Fletcher contacted Reppie Bautista, the chairperson of the ESO board, to tell her he could not attend the February 8 ESO board meeting due to a schedule conflict. Bautista told Fletcher to inform the other board members of the results of Fletcher's research. Fletcher telephoned some of the board members and recommended that the project be handled by Weathermaster.

During the latter part of February 1983, Westfall called Fletcher to ask if he wanted to invest in Westfall's takeover of Weathermaster. Fletcher said he would think about it. Fletcher spoke with his administrative assistant,

---

[1] Because we affirm the trial court's order granting the motion for judgment notwithstanding the verdict, we need not consider the appeal from the order granting a new trial since it is rendered moot. (Code Civ. Proc., § 629; *Conner* v. *Utah Constr. & Mining Co.* (1965) 231 Cal.App.2d 263 [41 Cal.Rptr. 728].)

Chuck Walton, about possible conflicts of interest. Walton and Fletcher agreed that Fletcher should not attend the February 28, 1983, ESO board meeting.

Fletcher, who was seriously considering Westfall's proposition, eventually decided to resign from the ESO board and submitted his letter of resignation on March 9, 1983.

On March 30, 1983, Fletcher and Westfall agreed to go into business together as 50 percent partners. Fletcher withdrew $40,000 from his savings account and deposited it into a Weathermaster account at the Bank of America in Milpitas.

Weathermaster submitted a bid for the ESO project on or about March 23, 1983. The ESO contract was awarded to a different company on March 28, 1983. However, Weathermaster did receive a fraction of the ESO weatherization work.

In July 1983, Phillip Trounstine, an editorial writer for the San Jose Mercury News, and Joe Melino, a member of the ESO board, attended a party in San Jose. At the party, Melino told Trounstine that Fletcher had tried to steer an ESO contract to a company called Weathermaster. Melino said Fletcher had a financial interest in the company while he was on the ESO board. Melino stated that he had asked Father Paul Goda, another ESO board member, to persuade Fletcher to resign from the agency due to Fletcher's relationship with Weathermaster.

Trounstine asked Melino to contact Goda to see if Goda would be willing to talk to Trounstine about Fletcher. A few weeks later, Melino reported that Goda was unwilling to speak to Trounstine.

In January 1984, Trounstine received information that the Santa Clara County District Attorney's office had investigated an alleged bribe attempt involving Fletcher and the executive director of ESO, Tommy Fulcher. Trounstine turned the information over to Mercury News reporter Scott Herhold for investigation.

Herhold immediately began investigating the story. As part of his research, Herhold contacted ESO board members Fulcher, Melino, Linda Castaldi, Jo Fields, YaYa DeLuna, and Miles Barber. Herhold also spoke with David Davies of the district attorney's office. Herhold interviewed several individuals connected with Tag Industries, the company which leased office space for Weathermaster's Milpitas office. These individuals included Leif Sethne, James O'Day, Gina Franconi, and Jack Kiewit.

Finally, Herhold, Herhold's editor, Mark Saylor, and the news editor of the Mercury news, Roger Ogelsby, interviewed Fletcher on February 27, 1984. This interview was tape-recorded and played for the jury.

### THE MARCH 4, 1984, ARTICLE

Herhold's first article appeared on Sunday, March 4, 1984, as the lead story, under the headline "Fletcher lobbied for own firm, agency officials say." The article, which is set forth in full in the appendix, went on for approximately 75 paragraphs to describe the allegations against Fletcher.

Much of the article detailed Fulcher's allegations against Fletcher. Herhold reported that (1) Fletcher brought Westfall to Fulcher's office and recommended that Weathermaster be given the ESO contract; (2) Fletcher asked whether Fulcher and his wife would like to take a trip to Hawaii. Fulcher interpreted this comment as a bribe; (3) Fletcher told Fulcher that " 'You know, there's something in this for you' "; (4) Fletcher handed Fulcher a contract awarding the contract to Weathermaster and asked Fulcher to sign it; and (5) Fletcher told Fulcher that " 'I've really got to have this contract. You promised me this contract and I made some financial commitments. I'm out on a limb for $40,000.' "

The March 4, 1984, article also described how Fletcher had lobbied several ESO board members to convince them to award the ESO contract to Weathermaster. ESO board member Joe Melino was quoted as stating, " 'I was extremely upset . . . I didn't think it was appropriate for a board member to act in that manner when he had apparent interest in a firm doing business with the agency.' "

Near the end of the story, Herhold reported that Westfall and Fletcher had visited the Tag office and the Milpitas Weathermaster office in late February or early March 1983. Herhold's sources for this information were Leif Sethne, James O'Day and the leasing agent for the Milpitas office. According to Sethne, Fletcher and Westfall visited Tag's office and discussed buying supplies and acquiring office space. In early March 1983, Westfall reportedly told O'Day that Fletcher was a 49 percent partner in Weathermaster. Finally, the leasing agent, who was not named in the article, reportedly "showed Westfall and Fletcher around the Milpitas office building in February or early March."

Interspersed throughout the story were rebuttals to the allegations against Fletcher. For example, the article noted that (1) Fletcher denied Fulcher's allegations and claimed that his partnership with Westfall did not commence until after he resigned from the ESO board; (2) the district

attorney's office had failed to uncover sufficient evidence to warrant prosecution of Fletcher; and (3) all of Fletcher's financial documents demonstrated that he had no financial interest in Weathermaster until late March 1983.

### THE MARCH 6, 1984, ARTICLE

The second article appeared on March 6, 1984, and was headlined "Fletcher helped firm before leaving agency, 2 say." The March 6 article included allegations by two Weathermaster saleswomen, Kaye Vaine and Donna Purcell. In substance, Vaine and Purcell stated that Fletcher and Westfall were present at a March 1, 1983, Weathermaster sales meeting. Vaine alleged that Westfall and Fletcher "boasted" that they would receive the weatherization contract. Purcell was quoted as stating, " 'I think Claude Fletcher was involved quite a bit before we got involved, . . . He didn't just get into it then. He knew what he was talking about.' "

The rest of the March 6, 1984, story summarized the information previously reported on March 4, 1984. The article also repeated Fletcher's denials of wrongdoing.

### THE MARCH 8, 1984, ARTICLE

Herhold's third article was published on March 8, 1984, and was titled "Fletcher to hold news conference on conflict of interest allegations." This article repeated Fletcher's denials, noted that Fletcher would hold a news conference to discuss the allegations and summarized the information in the previous articles.

### THE MARCH 10, 1984, ARTICLE

The fourth article appeared on March 10, 1984, and was headlined "Fletcher had earlier link to company, employees say." The article quoted two former Weathermaster salesmen, brothers David and Dutch Van Nus, as stating that Fletcher had attended a January 1983 Weathermaster sales meeting in Fresno. According to David Van Nus, Fletcher attended " 'six or seven' " Weathermaster meetings from January through March 1983. Herhold reported that David Van Nus believed Fletcher and Westfall had formed their partnership to obtain the weatherization contract from ESO. The article quoted David Van Nus as stating, " 'There's absolutely no doubt in my mind that Claude Fletcher was involved in Weathermaster before March 1.' " This quote was set out in bold and oversize type.

Dutch Van Nus was also cited in the March 10, 1984, story. According to Dutch Van Nus, nothing was mentioned at the Fresno meeting about

Fletcher becoming a partner in Weathermaster. Dutch Van Nus was quoted as stating, " 'He was just introduced as "Claude Fletcher," who used to work for us.' " The rest of the March 10 article reiterated Fletcher's denials of impropriety and summarized the information previously reported.

## THE MARCH 31, 1984, ARTICLE

The final article was published on March 31, 1984, under the headline "Salesmen no longer say Fletcher was at meeting." Herhold reported that Dutch Van Nus had denied making the statements in the March 10 story and instead claimed that the first time he saw Fletcher was in late March 1983. Herhold wrote that David Van Nus confirmed seeing Fletcher at several San Jose Weathermaster meetings before March 1983. However, David Van Nus could not be sure he had seen Fletcher in Fresno in January 1983. Herhold reported that David Van Nus said he was misquoted in the March 10 article and had not intended that his comments be publicized.

## EVENTS AT TRIAL

At trial, Sethne, O'Day, and Jack Kiewit, the previously unnamed leasing agent, testified that they did not make the statements attributed to them in the March 4 story. The Van Nus brothers also stated that they were inaccurately quoted. In particular, David Van Nus stated that he told Herhold that he had doubt in his mind about whether Fletcher was involved with Weathermaster prior to resigning from the ESO board. As previously noted, the March 10 article quoted Van Nus, in bold face type, as stating, " 'There's absolutely no doubt in my mind that Claude Fletcher was involved in Weathermaster before March 1.' "

Fulcher testified that Herhold had accurately reported his statements. Fulcher also testified that before the articles were published, Herhold contacted him approximately three to five times to make sure Herhold's interview notes were accurate. Likewise, Joe Melino testified that the statements attributed to him in the March 4 article accurately portrayed his comments. Both Kaye Vaine and Donna Purcell testified that Herhold's account was accurate. Finally, the testimony of the other ESO board members confirmed that Fletcher contacted them to recommend Weathermaster.

The jury returned a verdict for Fletcher on the libel cause of action and awarded him damages totalling $1,010,000. The trial court, however, granted respondents' motion for judgment notwithstanding the verdict on the ground that actual malice was not proved by clear and convincing evidence. This appeal followed.

Discussion

I. Libel

The issue before us is whether there is clear and convincing evidence that the articles were published with actual malice. Before addressing this point, we first set out the applicable law.

■ An essential purpose of the First Amendment is to protect the discussion of public affairs. (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 74-75 [13 L.Ed.2d 125, 132-133, 85 S.Ct. 209].) Discussion of such issues "has always rested on the highest rung of the hierarchy of First Amendment values." (*Carey* v. *Brown* (1980) 447 U.S. 455, 467 [65 L.Ed.2d 263, 273, 100 S.Ct. 2286].) This is because speech concerning public affairs is not just self-expression; it is the essence of self-government. (*Garrison* v. *Louisiana, supra,* 379 U.S. at p. 75 [13 L.Ed.2d at p. 133].)

■ "The public possesses an 'independent interest' in the qualifications and performance of its public officials." (*McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 859 [231 Cal.Rptr. 518, 727 P.2d 711], quoting *Rosenblatt* v. *Baer* (1966) 383 U.S. 75, 85-86 [15 L.Ed.2d 597, 605, 86 S.Ct. 669].) Accordingly, debate on public issues "may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 270 [11 L.Ed.2d 686, 700-701, 84 S.Ct. 710, 95 A.L.R.2d 1412].) "When a candidate enters the political arena, he or she 'must expect that the debate will sometimes be rough and personal, . . .'" (*Harte-Hanks Communications, Inc.* v. *Connaughton* (1989) 491 U.S. 657 [105 L.Ed.2d 562, 588, 109 S.Ct. 2678, 2695], quoting *Ollman* v. *Evans* (D.C. Cir. 1984) 242 App.DC 301 [750 F.2d 970] (Bork, J., conc.), cert. den., 471 U.S. 1127 [86 L.Ed.2d 278, 105 S.Ct. 2662].) An elected official cannot "cry Foul!" when an industrious reporter attempts to establish that he or she has less than sterling integrity. (*Harte-Hanks Communications, Inc.* v. *Connaughton, supra,* 491 U.S. at p. __ [105 L.Ed.2d at p. 588, 109 S.Ct. at p. 2695], quoting *Monitor Patriot Co.* v. *Roy* (1971) 401 U.S. 265, 274 [28 L.Ed.2d 35, 42, 91 S.Ct. 621].) Indeed, nothing is more alien to our national tradition than the notion that those in positions of public trust and authority are above criticism and must, at any price, be afforded the smiling admiration of the people.

The press plays a vital role in the discussion of public affairs. "[T]he press serves and was designed to serve as a powerful antidote to any abuses of power of governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." (*Mills* v. *Alabama* (1966) 384 U.S. 214, 219 [16

L.Ed.2d 484, 488, 86 S.Ct. 1434].) The press is "our citizenry's single most important check on governmental misconduct and secrecy." (*McCoy* v. *Hearst Corp., supra,* 42 Cal.3d at p. 859.) It is perhaps telling that throughout modern history the restriction of the press's freedom to report has always signaled the gradual degradation of the idea of liberty itself. A free press is simply an integral part of a free society. This principle was recognized by the founders of our nation over 200 years ago and remains a vital part of our national heritage today.

■ It is in this tradition, and to safeguard these principles that the law of libel has developed. In order for a public official to recover damages for libel, he or she must not only prove that a statement was false but must also prove that the statement was made with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706].) There must be clear and convincing proof "of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' . . . ." (*St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323], quoting *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 153 [18 L.Ed.2d 1094, 1110, 87 S.Ct. 1975].)

In determining whether there is evidence of actual malice, the test is not "whether a reasonably prudent man would have published, or would have investigated before publishing." (*St. Amant* v. *Thompson, supra,* 390 U.S. at p. 731 [20 L.Ed.2d at p. 267].) There must be evidence of *actual doubt* concerning the truth of the publication. (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 257 [208 Cal.Rptr. 137, 690 P.2d 610].)

In *St. Amant* v. *Thompson, supra,* 390 U.S. 727, the United States Supreme Court clarified the actual malice requirement: "The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." (*Id.* at p. 732 [20 L.Ed.2d at pp. 267-268].)

■ Finally, we note that the issue of actual malice is of such constitutional magnitude that it is not entrusted ultimately "to the judgment of the trier of fact." (*Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 501, fn. 17 [80 L.Ed.2d 502, 517, 104 S.Ct. 1949]; *McCoy* v. *Hearst,*

*supra,* 42 Cal.3d at p. 844.) Courts must make an independent constitutional judgment on the facts of the case. (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at p. 285 [11 L.Ed.2d at p. 709].) All evidence of malice must be independently reviewed and the court must "independently determine the constitutional import of any particular witness's testimony as it relates to the question of actual malice." (*McCoy* v. *Hearst, supra,* 42 Cal.3d at p. 846.) With these principles in mind, we now turn to the arguments raised by appellant.

Appellant contends that actual malice was established by clear and convincing evidence. He points to several examples of circumstantial evidence to argue that respondents knew the articles contained false statements. We examine each of these contentions below.

## A. Past Hostility

■ Appellant states that evidence of past hostility between the parties is competent to establish malice. Appellant relies upon a 1980 article, written by Trounstine, which was "highly critical" of appellant. Appellant also cites the fact that Trounstine described himself as "friendly" with one of appellant's political opponents.

There is little doubt that this evidence, by itself, is not enough to establish malice. A critical article written by Trounstine in 1980 hardly demonstrates that Herhold did not believe the March 1984 articles were true. Moreover, the role of the press includes publishing articles which are highly critical of public officials. As stated in *Rosenblatt* v. *Baer, supra,* 383 U.S. 75, 85 [15 L.Ed.2d at p. 605]: "Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized." In addition, the fact that Trounstine, who did not author the 1984 articles, was "friendly" with a political opponent of Fletcher, falls far short of the clear and convincing proof required to establish actual malice.

## B. Interview Style

■ Appellant next claims that evidence regarding Herhold's interview style suffices to show malice. He points to testimony that Herhold interviewed witnesses in a "slick," "devious" and "obnoxious" manner and tried to put words in the witness's mouth.

This testimony, while less than complimentary of Herhold's personal attributes, wholly fails to demonstrate that Herhold did not believe the articles were true. The fact that a reporter is aggressive and abrasive in attempting to ferret out information from reluctant individuals is, in itself,

hardly surprising. We think that Herhold's interview style evinced no more than evidence of "zealous investigative reporting." (*Jenoff* v. *Hearst Corp.* (D.Md. 1978) 453 F.Supp. 541, 549-550, affd. (4th Cir. 1981) 644 F.2d 1004 [reporter called plaintiff and stated, " 'We know all about you, and you better confess,' " and also told plaintiff that he would " 'burn' " if he did not corroborate certain facts].) Suffice it to say that characterizing a reporter as "slick" or "devious" does not, in our minds, trigger a question about that reporter's belief in the truth of the story.

## C. Present Hostility

■ Appellant also points to the fact that Herhold allegedly called Fletcher a "crook" and stated "We have to get people like this out of office." Once again, appellant relies upon Herhold's personal attitudes to raise an inference that the articles were published with reckless disregard for the truth. In so doing, appellant confuses the concept of actual malice with ill will or "malice" in the ordinary sense of the term.

Ill will and constitutional malice are not the same. " '[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.' " (*Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 281 [41 L.Ed.2d 745, 760, 94 S.Ct. 2770], quoting *Rosenbloom* v. *Metromedia Inc.* (1971) 403 U.S. 29, 52, fn. 18 [29 L.Ed.2d 296, 317, 91 S.Ct. 1811]; see also *Harte-Hanks Communications, Inc.* v. *Connaughton, supra,* 491 U.S. at p. __ [105 L.Ed.2d at p. 576, 109 S.Ct. at p. 2685].) For appellant's argument to satisfy the *New York Times* standard, appellant must link Herhold's statements to Herhold's awareness of probable falsity. Appellant, however, fails to make this connection. Not only do Herhold's statements fail to show that the articles were published with reckless disregard for the truth but, if anything, the statements suggest Herhold believed that the allegations against Fletcher were true. Given the information provided by Fulcher, which Fulcher confirmed at trial, Herhold's opinions seem only a "reaction to what he had learned in preparing to write the article, and [do] not indicate a state of mind that would suggest that he had serious doubts about the article's veracity." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 260, [while preparing article, defendant wrote letter which stated that the plaintiff seemed "very, very nasty indeed."]; see also *Flotech, Inc.* v. *E.I. Du Pont de Nemours & Co.* (1st Cir. 1987) 814 F.2d 775, 781-782 [author's letter referring to plaintiffs as " 'Snake-Oil Producers' " consistent with a belief that story was true].) In sum, we see nothing in Herhold's statements which suggests a willingness to publish unsupported allegations.

## D. Lack of Objectivity

■ Appellant argues that misleading headlines, the fact that information was omitted from the stories and a failure to further investigate

constitute evidence of malice. Appellant supports his argument with testimony from a Stanford University journalism professor, Jeremy Cohen. At trial, Cohen testified that respondents had failed to follow certain accepted journalism practices and were less than objective in presenting the story about Fletcher.

It is of course a general maxim in journalism that a story be reported in an objective manner. We are not told, however, whose standard of objectivity is to be applied. Is it the editor's, the reporter's or indeed a more ethereal definition of objectivity that guides the author's account? When it comes to the complicated task of subjecting an allegedly libelous article to constitutional scrutiny, we are mindful of Lord Macaulay's observation that "nothing is so useless as a general maxim." (On Machiavelli (1827).)

In applying a constitutional test we note that there is no requirement that an article be objective. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 259, citing *New York Times Company* v. *Connor* (5th Cir. 1966) 365 F.2d 567, 576.) Nor is there a requirement that a publisher write an accurate account. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 259, citing *Time, Inc.* v. *Pape* (1971) 401 U.S. 279 [28 L.Ed.2d 45, 91 S.Ct. 633].) "Fair and objective reporting may be a worthy ideal, but there is also room, within the protection of the First Amendment, for writing which seeks to expose wrongdoing and arouse righteous anger; clearly such writing is typically less than objective in its presentation." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 259.)

Appellant suggests that the failure to follow professional journalism standards, as outlined by Professor Cohen, constitutes actual malice. However, this court does not sit " 'as some kind of journalism review seminar offering our observations on contemporary journalism and journalists.' " (*Tavoulareas* v. *Piro* (D.C. Cir. 1987) 817 F.2d 762, 796, citing *Tavoulareas* v. *Piro* (D.C. Cir. 1985) 759 F.2d 90, 145 [Skelly Wright, J., conc. in pt. and dis. in pt.].) The question we face is whether respondents believed the articles were untrue, not whether their reporting practices passed Professor Cohen's test. As recently declared by the Supreme Court in *Harte-Hanks Communications, Inc.* v. *Connaughton, supra,* 491 U.S. 657 [105 L.Ed.2d 562, 109 S.Ct. 2678], "Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court." (*Id.* at p. ___ [105 L.Ed.2d at p. 576, 109 S.Ct. at p. 2685].)

In any event, these articles did present Fletcher's side of the story, so they cannot be said to be completely one-sided. While the articles were clearly not a model of "objective reporting," they were not as slanted as appellant

suggests. The March 4 story stated (1) Fletcher's contention that he had no financial interest in Weathermaster until after he resigned from the ESO Board; (2) that the documentation bore out Fletcher's claim; and (3) that the district attorney's office concluded there was insufficient evidence to warrant prosecution. Moreover, each of the follow-up articles repeated Fletcher's denials of wrongdoing. In addition, on March 9, 1984, the Mercury News published a transcript of Fletcher's news conference in which Fletcher detailed his position.

Finally, appellant contends that a retraction demand notified respondents of the need for additional investigation. This same argument was rejected in *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at page 260, "The threat of a libel suit . . . might well give a publisher pause, but it would not necessarily lead it to doubt the truthfulness of its article or its sources." As stated in *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at page 279 [11 L.Ed.2d at page 706], "[T]he critic of official conduct . . ." is not compelled "to guarantee the truth of all his factual assertions . . ." for "to do so on pain of libel judgments virtually unlimited in amount" results in "self-censorship."

### E. ERRONEOUS QUOTE

Appellant also contends that malice was demonstrated by the fact that Herhold fabricated information. Appellant cites the March 10 story quoting David Van Nus as stating, "There's absolutely no doubt in my mind that Claude Fletcher was involved in Weathermaster before March 1." At trial, Van Nus testified that he had "doubt in my mind" about whether Fletcher was involved.

Herhold testified that the quote accurately portrayed Van Nus's comments. However, Herhold's notes of his interview with Van Nus state, " 'There is no, absolutely'—I have 'doubt in my mind that Claude Fletcher was involved in Weathermaster before March 1.' " When asked to explain the discrepancy, Herhold stated, "I was searching to try to put down as closely as I could his exact language, and I was trying to recall in my mind whether he said there's absolutely no doubt in my mind or I have no doubt in my mind, and I wrote down both beginnings, and in doing so mistakenly left out the 'no.' "

Although the conflict between Herhold's notes and what Herhold wrote is troubling, we do not think it demonstrates with convincing clarity that Herhold believed the allegations against Fletcher were unfounded. When Herhold interviewed Van Nus, he was attempting to corroborate the information already provided by other sources. Given the information Herhold

had already discovered, the Van Nus quote was not so improbable as to support the inference that Herhold had deliberately falsified Van Nus's remarks. (*Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 147 [162 Cal.Rptr. 701].) Moreover, Herhold's good faith is demonstrated by the fact that the March 31 story included Van Nus's claim that the March 10 article had misquoted him.

In sum, we conclude the evidence of actual malice is neither clear nor convincing. Perhaps Herhold did not like Fletcher. After hearing Fulcher's comments, this opinion is hardly surprising. And perhaps the Mercury News articles were less than objective. Clearly the articles contained factual errors. But was there clear and convincing evidence that Herhold did not believe his story was true?

We do not think so. To the contrary, the evidence suggests a sincere attempt to report what the Mercury News viewed as unethical behavior on the part of a San Jose public official. Herhold spent over one month researching this story. He interviewed approximately 20 persons as part of his investigation. Herhold's key source, Fulcher, was accurately quoted, as were the allegations attributed to the other ESO board members. Herhold had no cause to doubt the reliability of his sources; they were, for the most part, inherently reliable. Indeed, Fulcher was the executive director of the ESO. (Compare *Harte-Hanks Communications, Inc.* v. *Connaughton, supra,* 491 U.S. 657 [105 L.Ed.2d 562, 109 S.Ct. 2678] [Newspaper failed to interview key witness, failed to listen to crucial taped interview and published charges of misconduct based upon statement by one witness even though five other witnesses stated the charges were untrue].)

In addition, Fletcher himself was interviewed by respondents before the articles were published. The tape recording of this interview is revealing. During the interview, Fletcher stated, "I saw a chance to move into that [weatherization] field and I took that opportunity, yes, and granted, it did come about because of that investigation on behalf of the public agency, sure it did . . ." Yet at the same time, Fletcher stated that the weatherization contract "was simply a tangent—well—it was just a minor part . . . it had nothing to do with what ESO was doing . . . that contract with ESO was not the motivating factor."

During the interview, Fletcher flatly denied making the statement regarding the trip to Hawaii. Yet after the interview, Fletcher asked Fulcher to tell the Mercury News that Fulcher might have misinterpreted the Hawaii comments. Fulcher reported this conversation to the Mercury News.

As the trial court noted, such disclaimers would be unconvincing to most reasonable people. But to a group of seasoned reporters, Fletcher's

interview statements and postinterview conduct may have appeared the ultimate verification for their story line.

In sum, the most these circumstances show is a series of articles which contained some factual errors. But mere errors are not enough to support a libel claim. "[E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'." (*New York Times* v. *Sullivan, supra,* 376 U.S. at p. 271-272 [11 L.Ed.2d at p. 701], quoting *N.A.A.C.P.* v. *Button* (1963) 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328].)

 We conclude that actual malice was not proved by clear and convincing evidence and therefore affirm the trial court's order granting respondents' motion for judgment notwithstanding the verdict.

## II. Slander

 Respondents' nonsuit motion as to the slander cause of action was granted on the ground Herhold's comments were a constitutionally protected statement of opinion. For reasons we will state, we conclude that the trial court did not err in granting the motion.

After the first few articles were published, Herhold interviewed David Scott, a former employee of Weathermaster. In his testimony, Scott described how Herhold tried to persuade Scott to corroborate information about Fletcher. During their conversation, Herhold allegedly stated that Fletcher "was a crook and a crooked politician and I don't want him to be reelected."

Were Herhold's statements fact or opinion? This question is crucial because "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997], fn. omitted.)

To determine whether a statement is fact or opinion we consider the "totality of the circumstances." (*Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) This requires that we consider the language used and the context in which the statement was made. (*Id.* at pp. 260-261.)

 We think that the circumstances here demonstrate that Herhold's statements were an opinion. Herhold was merely attempting to obtain

corroborating information from Scott and in so doing used inflammatory language in an effort to persuade Scott to talk. Where "potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425]; see also *Lewis* v. *Time Inc.* (9th Cir. 1983) 710 F.2d 549, 553.) Moreover, because the statement, "I don't want him reelected" was added to Herhold's comments, it seems clear that Herhold was merely expressing his opinions about Fletcher.

In sum, Herhold's comments, we think, were merely rhetorical and hyperbolic language. Herhold was not charging Fletcher with a specific crime. Instead, the statements were a broad, unfocused and wholly subjective comment. (*Lewis* v. *Time Inc., supra,* 710 F.2d at p. 554 [lawyer referred to as "shady practitioner."].) Indeed, in *Lauderback* v. *American Broadcasting Companies* (8th Cir. 1984) 741 F.2d 193, the court concluded that referring to an insurance agent as a "crook" constituted a statement of opinion. (*Id.* at pp. 197-198.)

"It is an essential part of our national heritage that an irresponsible slob can stand on a street corner and, with impunity, heap invective on all of us in public office." (*Desert Sun Publishing Co.* v. *Superior Court* (1979) 97 Cal.App.3d 49, 51 [158 Cal.Rptr. 519].) Indeed, "Our political history reeks of unfair, intemperate, scurrilous and irresponsible charges against those in or seeking public office. Washington was called a murderer, Jefferson a blackguard, a knave and insane (Mad Tom), Henry Clay a pimp, Andrew Jackson a murderer and adulterer, and Andrew Johnson and Ulysses Grant drunkards. Lincoln was called a half-witted usurper, a baboon, a gorilla, a ghoul. Theodore Roosevelt was castigated as a traitor to his class, and Franklin Delano Roosevelt as a traitor to his country. Dwight D. Eisenhower was charged with being a conscious agent of the Communist Conspiracy." (*Id.* at p. 51.) Suffice it to say that good taste has never been a prerequisite to First Amendment protections.

Herhold's statements simply reflected his opinion about Fletcher based upon the information Herhold learned while pursuing the story. His opinion is protected under the First Amendment of the United States Constitution.

We conclude that the trial court did not err in granting respondents' motion for nonsuit on the slander cause of action.

The judgment is affirmed.

Capaccioli, Acting P. J., and Premo, J., concurred.

A petition for a rehearing was denied November 27, 1989, and appellant's petition for review by the Supreme Court was denied February 1, 1990.

APPENDIX

San Jose Mercury News 3/4/84 p. 1A

# Fletcher lobbied for own firm, agency officials say

(picture omitted) "The suggestion that I would even consider to influence anyone improperly is absurd."

— *Claude C. Fletcher*

By Scott Herhold
Staff Writer

San Jose Councilman Claude C. Fletcher, while serving last year on the board of directors of Santa Clara County's largest anti-poverty agency, tried to steer a $1.6 million contract to a firm in which he became a partner, according to five officials of the agency.

Fletcher says he left the board of the agency, Economic & Social Opportunities Inc., to avoid a conflict of interest. But two ESO officials and two men who did business with Fletcher suggest that the councilman had a financial interest in the firm, an insulation business called Weathermaster Co., before he resigned from the ESO board on March 9, 1983.

Tommy Fulcher Jr., the executive director of ESO, said he and Fletcher had several conversations in which the councilman lobbied for Weathermaster as a contract recipient. During one of those, Fulcher said, Fletcher asked him whether he and his wife would like to take a trip to Hawaii.

Fulcher said he rejected the offer, which he interpreted as a bribe.

Fletcher denied the allegations. "The suggestion that I would even consider to influence anyone improperly is absurd," he said.

*Back of Section Col. 1*

(picture omitted) "He just kind of slipped it in: 'How would you and your wife like a trip to Hawaii?'"

— *Tommy Fulcher Jr.*

*Continued from Page 1A*

The 45-year-old councilman, a management consultant and political conservative, attributed the allegations against him to a "political vendetta" that he said began with his investigation into ESO's accounting procedures two years ago.

Fletcher said his position as an ESO board member allowed him to spot a business opportunity that turned a profit for him after his resignation.

District Attorney Leo Himmelsbach's office, told of the charges by Fulcher in May, spent several months investigating Fletcher's business dealings.

Assistant district attorney David Davies said the investigation failed to

uncover sufficient evidence for criminal prosecution. Davies said the evidence showed that Fletcher did not have a financial interest in the insulation firm until after he resigned from the ESO board.

But Davies said the district attorney's office had not served search warrants or subpoenas for Fletcher's bank records or office records. He said his investigators examined records Fletcher supplied.

Davies acknowledged that it was possible that his investigators may have missed something.

"Occasionally, you come up with something that we may have missed. All we can do is look at what's available and then make a decision," he said.

"We had some statements that were definite. But we had some other statements that were very contradictory. On the surface, all the documentation supports Fletcher's story."

In interviews with the Mercury News, two ESO officials and two businessmen who shared an office building with Fletcher said that before he resigned from the ESO board, the councilman either acted on behalf of the firm or told them that he had a financial stake in the company. Three of those sources said they were not contacted by the district attorney.

In addition, a leasing agent for the Milpitas office building that Fletcher's insulation company occupied said Fletcher was present when the new tenants inspected the quarters. The leasing agent says his datebook reveals that he showed the property March 4, 1983.

According to ESO board members, Fletcher lobbied hard during February and March 1983 to direct the ESO contract for insulating poor people's homes to the Weathermaster Co., a firm that he formally incorporated in April with a Fresno partner, Archie Westfall.

The insulation company, which had offices at 1000 Ames Avenue in Milpi-

tas, ultimately received only a fraction of the ESO contract.

Although Fletcher called the business "very profitable," he said he ended the partnership in January of this year because "I simply did not enjoy the association of the people involved."

The state's Political Reform Act says that "no public official at any level of state or local government shall make, participate in making, or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

Davies, the assistant district attorney, said he believes the law applies to the ESO board. He pointed out that Fletcher was appointed to the board as San Jose's official representative.

ESO, a private, non-profit agency, runs programs intended to benefit the poor. Like most other anti-poverty agencies afflicted by Reagan-era cutbacks, it has sought ways to raise money from sources other than government.

In December 1982, an opportunity arose. A consortium of anti-poverty agencies, called Cal-Neva, received approval from Pacific Gas & Electric Co. and the state Public Utilities Commission to begin a $22 million-per-year program to insulate the homes of the poor for free. The costs were charged to all electricity ratepayers.

Cal-Neva contracted with local anti-poverty agencies such as ESO. With PG&E paying an average of about $800 per house, ESO could make as much as $100 on each. The anti-poverty agency also stood to make a bonus of as much as $180,000 for completing all 2,100 homes in its allotment.

The 11-member ESO board first considered the venture at its Jan. 24, 1983, meeting—and the board members were skeptical.

Embarrassed two years before by the collapse of Project Greenhouse, an ill-conceived attempt to make money by growing gourmet cucumbers, the ESO board was on the verge of rejecting the

contract when Fletcher volunteered to look for a subcontractor to assume the risks.

By his own account, Fletcher turned for advice to an old acquaintance, Archie Westfall, a veteran salesman and former pheasant rancher. Fletcher and Westfall had worked together as salesmen more than 20 years before at Weathermaster Co., an insulation firm in Fresno. (The two firms of the same name are separate businesses.)

Fletcher said he cannot remember whether he spoke with Westfall before or after ESO began considering the contract. But the councilman said he learned in "mid- to late February" that Westfall intended to sever his relationship with his longtime Fresno partner, R. Donald Smith.

"In talking with Westfall, I saw the

---

"I have no way of knowing why (Fulcher) would tell you that. Why hasn't he ever mentioned it to me? If he ever had an offer, it certainly should have been brought out."

— *Councilman Claude C. Fletcher*

---

business was going to have a change," Fletcher said. "I said (to myself), 'Why not move into that void and why not make a profit from it?' And I did that."

The councilman insisted that he did not begin his partnership with Westfall until late March, after he resigned from the ESO board. According to records provided by Fletcher, his $40,000 investment in the firm was deposited in the bank March 30.

Fletcher denied that he had lobbied any board member or ESO executive for Weathermaster before his resignation.

Fletcher also downplayed the importance of the ESO contract to Weathermaster, saying it was not his motivation for going into business with Westfall. But Westfall offered a conflicting version.

"The reason I wanted to come to San Jose was because of the low-income business," Westfall said. "When I met Claude, I set up the office, and then he became involved down the line."

Several ESO officials and Fletcher business acquaintances tell a story that sharply departs from Fletcher's version. Chief among them is ESO's director, Fulcher, a Vietnam War veteran and two-time Bronze Star recipient with a master's degree in business administration from Harvard University.

According to the ESO director, Fletcher brought Westfall by the ESO offices about a week after the agency's January board meeting, warmly recommending him for the contract.

"It appeared as if he was saying, 'Let us handle the contract,'" Fulcher recalled.

Over the next month, Fulcher said, he had numerous telephone calls and went to lunch twice with Fletcher—by his datebook, Jan. 31 and Feb. 7. According to the ESO director, Fletcher became more aggressive in his attempts to secure the contract for Weathermaster.

Fletcher billed the city for a $14.82 lunch with Fulcher on Jan. 31 at Plateau 7. During that meeting, Fulcher said, the councilman told him, "You know, there's something in this for you." Fulcher said he ignored that comment.

In a meeting at Fletcher's City Hall office before the second lunch, according to Fulcher, Fletcher handed him a proposed contract between Weathermaster and ESO and asked him to sign it.

"I told him no, it had to go by the board," Fulcher remembered. "He said, 'The board's already given you permission to do this project.' I said,

'Yes, but they didn't give me permission to sign a contract.'"

Fulcher has given the Mercury News a copy of that unsigned contract, which calls for all of ESO's insulation business to be directed to Weathermaster and for ESO to receive a 5 percent administration fee. The contract was to begin March 15.

Fletcher said he had never seen the contract before. "I don't personally remember that contract," Fletcher said. "I knew that Tommy could not execute such a contract."

In a series of ensuing phone calls, Fulcher said, Fletcher pressed him harder, saying at one point, " 'I've really got to have this contract. You promised me this contract and I made some financial commitments. I'm out on the limb for $40,000.'"

According to Fulcher, the councilman called him at home, and "we were talking about the contract, and he just kind of slipped it in: 'How would you and your wife like a trip to Hawaii?'"

Fulcher says he rejected the offer.

"I told him I had been to Hawaii six times and I wasn't interested in going again," he said.

Fletcher flatly denied the allegation of a bribe. "I have no way of knowing why he would tell you that," Fletcher said. "Why hasn't he ever mentioned it to me? If he ever had an offer, it certainly should have been brought out."

---

"I didn't think it was appropriate for a board member to act in that manner when he had apparent interest in a firm doing business with the agency."

— ESO board member Joe Melino

---

Fulcher said his initial reaction to the offer was shock, followed by outrage.

"I was really in a quandary," Fulcher said. "It scared me. I didn't know what he was doing. I thought maybe he was trying to set me up. It was like being sick, like walking around with a migraine headache, wondering whether they were going to come and snatch me up."

Fulcher said he did not go immediately to the district attorney, although he did tell some other board members about the offer. Board member Joe Melino confirmed that Fulcher told him that Fletcher had offered him a bribe.

"I had to talk to people," Fulcher said. "I had to think it through. I really didn't want to go (to the district attorney). I was afraid. I didn't want to get involved in politics. I was hoping it would go away."

At its March 28 meeting, the ESO board of directors tentatively decided to award the ESO insulation contract to a consortium of Hispanic bidders. One reason, according to several board members, was the irritation with Fletcher's lobbying on behalf of Weathermaster.

"I was extremely upset," Melino said. "I didn't think it was appropriate for a board member to act in that manner when he had apparent interest in a firm doing business with the agency."

Among the other ESO board members who say Fletcher lobbied them were Melino, Linda Castaldi, YaYa De-Luna, Jo Fields and Miles Barber. Melino and Castaldi say they were called in February. Fields, DeLuna and Barber say their calls came in March.

With the exception of Barber, the board members said that when Fletcher called, they believed he was still a board member. Barber said he cannot remember whether Fletcher already had resigned. Fields said Fletcher told her during the conversation that he intended to resign.

Ultimately, the lobbying bore little fruit. Not until October, after the contract was divided up among a number of subcontractors, did Weathermaster receive an ESO contract—and then for only 50 homes.

Fulcher says he didn't approach the district attorney until May, after Fletcher confronted ESO's weatherization program manager, Larry Dowd, about Weathermaster's lack of a contract.

"It had gone far enough," Fulcher said.

The ESO director says he first talked with City Attorney Robert Logan.

"I wanted some advice about what to do," he said. "I wanted to know if I was doing something illegal by not reporting it. I wanted it kept in confidence."

Logan declined to comment about any conversations he had with the ESO director or with Fletcher. "The answer to that is with the district attorney's office," Logan said.

Assistant district attorney Davies initially declined comment on the probe. But after a request by Fletcher, the district attorney's office released a statement to the Mercury News two weeks later.

Davies said the investigation had shown that "all the evidence" showed that Fletcher did not have any interest in the Weathermaster firm until March 25, 1983. Davies declined to say what that interest was.

Including Fulcher, four of Fletcher's fellow board members or business acquaintances suggested to the Mercury News that Fletcher's financial interest in Weathermaster predated his resignation from the ESO board.

One of their contentions is that Fletcher, before his resignation, visited the 1000 Ames Avenue site that Weathermaster occupied and the nearby offices of Tag Industries, a major supplier of Weathermaster.

Leif Sethne, a director of Tag Industries, which is now defunct but moved into the Ames Avenue building with Weathermaster, said Fletcher and Westfall came by Tag's offices in late February to discuss buying supplies and acquiring office space.

Sethne said he assumed Fletcher was in business with Westfall. The Tag

director said the conversation occurred well before he left with his wife for Hawaii on March 8, 1983.

Sethne's recollection was backed up by James O'Day, the former president of Tag, who confirmed that Fletcher stopped by his offices in late February or very early March.

O'Day said he had a conversation at the beginning of March with Westfall, who told him Fletcher was a "49 percent" partner in Weathermaster.

The leasing agent for the Ames Avenue building, who asked that his name not be used, says he showed Westfall and Fletcher around the office building in February or early March.

After initially denying that he had been at the building until April, Fletcher said that "it's possible" that he stopped by to look at the property while driving around with Westfall. "But I don't recall being there until April," he said.

Finally, ESO board member Melino said Fletcher called him in March and lobbied hard for Weathermaster. Melino quoted Fletcher as saying that "I've got a personal interest in this, you know." Although Melino said he can't remember the precise date, he said he wasn't aware of Fletcher's intention to resign at the time of the phone call.

Sethne, O'Day and Melino said the district attorney did not talk to them. The leasing agent said an investigator called him in October or November and interviewed him only on the telephone.

On the incorporation papers filed for the firm on April 15, Fletcher was listed as the "agent for service," meaning that he accepted legal papers for the firm. On later documents, he was described as its vice president and chief financial officer.

Westfall, 58, was listed as the chief executive officer. Fletcher called him a "highly capable guy" who knew the insulation business.

But a number of people disagree with that assessment of Westfall. In Fresno, Superior Court files show that

two judgments have been entered against him on behalf of creditors who claimed that Westfall did not pay them for supplies. The amounts are $9,000 and $17,000. In a third case, Westfall was sued for $11,500. All three firms who sued say the debts still have not been paid.

Westfall's former firm, Beneficial Brokerage, a building supply firm, was investigated by the State Board of Equalization in 1977 for non-payment of sales tax. A report by an administrative hearing officer, Donald J. Hennessy, recommended that fraud penalties be exacted against Beneficial.

Westfall said he paid a back tax bill of $6,800 and cleared himself of the fraud charges. He called himself an "innocent bystander" in Beneficial's problems, although he acknowledged he was listed as its president.

San Jose Mercury News 3/6/84 p. 1A

# Fletcher helped firm before leaving agency, 2 say

### By Scott Herhold
Staff Writer

Two saleswomen who worked for San Jose Councilman Claude Fletcher in his insulation business last year said Monday that Fletcher was recruiting a sales force at least a week before he resigned as a director of an anti-poverty agency from which the insulation firm sought a contract.

The statements of the two women raise fresh questions about whether the councilman, who was the chief financial officer of a firm called Weathermaster Co., had a financial interest in the business before he left the board of Economic & Social Opportunities Inc.

Fletcher has denied any conflict of interest and insisted that his financial involvement in Weathermaster began only after his resignation on March 9, 1983, from the board of ESO, the anti-poverty agency.

But the statements by the two women, Kaye Vaine, 36, of San Jose, and Donna Purcell, 41, who now lives in Alberta, Canada, contradict the councilman's version.

Vaine said she attended a meeting on March 1, 1983, at which Fletcher and his partner in the Weathermaster firm, Archie Westfall, boasted that they would receive a contract for insulating low-income homes. She said the meeting at the Seasons Restaurant on Monterey Road in San Jose was called to recruit sales people for the fledgling insulation firm.

"Basically the thrust of his (Fletcher's) conversation was that they had already made the application and that he had every reason to believe he would be chosen," Vaine said. "The told us they were going to have an exclusive on the contract in Santa Clara County."

Weathermaster, which had offices at 1000 Ames Ave. in Milpitas, was one of the companies vying for a $1.6 million contract that ESO

*Continued on Page 6A*

# Fletcher helped company before leaving agency, 2 say

*Continued from Page 1A*

administered for insulating poor people's homes. The program was funded by Pacific Gas & Electric ratepayers.

Ultimately, Weathermaster won only a tiny fraction of the work.

The Mercury News reported Sunday that five officials of the anti-poverty agency, including executive director Tommy Fulcher Jr., said that Fletcher attempted to steer the ESO contract to Weathermaster while still an ESO director.

Fletcher could not be reached for comment Monday on the women's statements, although phone messages were left at both his home and office.

Earlier in the day, however, he issued a statement to other members of the San Jose City Council.

"Sunday's Mercury News article was extremely inaccurate and unfair and portrays me in a false light," he said. "We are in the process of going through my records for the purpose of accurately setting forth all the facts. I should finish this task in the next few days. At that time, I will set forth the whole truth of what occurred and I feel confident the public will agree with me

that the Mercury News staff did a very sloppy job of reporting or for some other reason has misstated the information it collected."

District Attorney Leo Himmelsbach's office, informed of the conflict charges last May by ESO's director, Fulcher, spent several months examining Fletcher's business dealings.

The district attorney concluded that there was insufficient evidence to prosecute and that the documentation showed that Fletcher's interest in Weathermaster began after his resignation from the ESO board.

On Monday, Himmelsbach said, "I don't really think I should publicly comment. We've generally had a policy that we don't comment on investigations, at least during an investigatory stage."

Himmelsbach declined to say whether his office was re-opening the investigation. But he hinted that it may: "Our office is always willing to follow a new lead in any investigation," he said. "I don't know that we should be concerned about what the source of the lead is. If we receive new information

· (picture omitted)

## Claude Fletcher
### . . . Plans public denial

that might shed some light on it, we're willing to look at it."

The state's Political Reform Act says that "no public official at any level of state or local government shall make, participate in making, or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

Kaye Vaine's 1983 datebook shows that she attended the sales meeting on Tuesday, March 1, eight days before Fletcher's departure from the ESO board. Purcell, while not remembering the precise date, said she believes the meeting occurred at the beginning of March.

Like several other people who suggested to the Mercury News that Fletcher's financial interest in Weathermaster began before his resignation, both women say they were not contacted by the district attorney.

Vaine worked as a sales representative for Weathermaster for two months, with Purcell staying a few months longer. Both said they were angered at Fletcher because of what they said was Weathermaster's niggardly policy in paying its sales people.

"We were promised the sky and it never came," Vaine said. "I felt that Archie and Claude would never give me a straight answer. Whenever I had a question, I got a fast shuffle."

"Claude happens to be a city councilman, and he has the inside track on getting us the contract. . . ."

— *Kay Vaine quoting Archie Westfall in substance*

In describing the March 1 meeting, which they said was attended by about 20 salespeople, both women remembered that Fletcher and Westfall sounded confident that Weathermaster would receive the low-income contract.

"I think Claude Fletcher was involved quite a bit before we got involved," Purcell said. "He didn't just get into it then. He knew what he was talking about."

Vaine, who now works for ESO determining whether low-income people qualify for the weatherization program, said that Westfall spoke first, explaining that they would be insulating homes under PG&E's zero-interest loan program and introduced Fletcher as a partner in Weathermaster.

"Now that Claude has joined us, we have a wonderful opportunity to offer to all of you," she remembered Westfall saying. Vaine said that Westfall bragged that they had an "exclusive" on receiving a contract for insulating low-income homes.

"Claude happens to be a city councilman," she quoted Westfall as saying in substance. "And he has the inside track on getting us the contract. The wheels are in motion. We expect to have it."

Both women said Weathermaster promised $50 per household that the salespeople were able to enlist for the program.

Vaine said she attended weekly meetings for six to seven weeks after the March 1 meeting. She said the number of people attending the sales meetings dwindled because Weathermaster trimmed the commissions it promised.

*Staff Writer Maline Hazel contributed to this report.*

San Jose Mercury News 3/8/84 p. 1B

# Fletcher to hold news conference on conflict of interest allegations

**By Maline Hazle**
Staff Writer

San Jose Councilman Claude Fletcher said he will hold a news conference at 2 p.m. today to discuss allegations that he tried to steer a $1.6 million anti-poverty agency contract to a firm in which he became a partner.

Fletcher has denied any conflict of interest and says his financial involvement in Weathermaster Co., an insulation firm, began only after his March 9, 1983, resignation from the board of Economic & Social Opportunities Inc.

The Mercury News reported Sunday that ESO Executive Director Tommy Fulcher and four other ESO officials said Fletcher, while still an ESO board member, lobbied for the award of the insulation contract to Weathermaster.

Fletcher has denied that he had lobbied any board member or ESO executive for Weathermaster before his resignation. He also said he did not have a financial interest in Weathermaster until late March 1983, after his resignation from the ESO board.

But on Monday, two saleswomen who worked for Weathermaster said Fletcher was recruiting a sales force at least a week before his resignation from the board.

Weathermaster later received only a small fraction of the $1.6 million contract. Fletcher's partnership in the firm was terminated in January, he said.

Meanwhile, San Jose City Attorney Bob Logan said Wednesday that city laws only prohibit *former* council members from becoming involved in businesses affected by decisions they made as council members. The law forbids such business relationships for a year after council members leave office.

"The idea of any 'revolving door' ordinance is to catch them on the way out," Logan said. "No, it does not apply to Fletcher. He's still a member of the council."

"There are no other ordinances in the city municipal code to cover business activities while they are in office."

Logan said that "we've got a state law that would do what needs to be done" about business dealings of officeholders.

The state's Political Reform Act says that "no public official at any level of state or local government shall make, participate in making, or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest."

Logan declined to say whether he believes that the state law applies to Fletcher's case.

"That's up to the district attorney's office," he said. "I'm not going to second-guess them."

District Attorney Leo Himmelsbach's office spent several months investigating the ESO allegations but did not find sufficient evidence for prosecution. Deputy district attorney Dave Davies has said he believes the state law would cover the actions of a San Jose council member serving on the ESO board.

At Fletcher's request, Himmelsbach's office released a statement last week saying the investigation has ended. Himmelsbach has refused to say whether he is reopening the investigation as a result of Mercury News accounts.

(picture omitted)

Claude Fletcher
. . . *Denies any conflict*

Many of the people who spoke with the Mercury News said they had not been contacted by the district attorney.

San Jose council members have been close-mouthed about the allegations.

"Councilman Fletcher stated in his memo of March 5 that the facts were inaccurately reported in the Mercury News article and that he will be releasing information shortly which proves this," Mayor Tom McEnery said Wednesday. "In all fairness to Mr. Fletcher, reaching a conclusion on this matter would be premature at this time."

Other council members agreed.

"What we do could do harm and damage to whatever is the truth if we go off half-cocked before Claude has a chance," Iola Williams said. "To comment would not be appropriate."

Councilman Jim Beall said he wants to "sit back and listen" to Fletcher before commenting.

Fletcher was appointed to the ESO board two years ago by then-Mayor Janet Gray Hayes. The city has a representative on the board of the private, non-profit agency because part of the city's federal Community Development Block Grant fund goes to the agency.

This year the city gave $80,000 to ESO, $50,000 to a program for the handicapped and $30,000 to the Citizens' Home Energy Project, a 6-year-old home insulation program that is not connected to the contract sought by Fletcher's firm.

San Jose Mercury News 3/31/84 p. 1A

## Salesmen no longer say Fletcher was at meeting

**By Scott Herhold**
Staff Writer

Two former salesmen for the Weathermaster Co., an insulation firm in which San Jose Councilman Claude Fletcher was a partner, have changed their accounts of Fletcher's involvement in the business last year.

The two salesmen, Dutch and David Van Nus, who are brothers, told the Mercury News in separate March 7 interviews that they met Fletcher at Weathermaster offices in Fresno in January 1983.

But on Wednesday, Dutch Van Nus denied that he had made that statement. He said Wednesday that the

## Salesmen no longer place Fletcher at meeting

*Continued from Page 1A*

first time he saw Fletcher was when he helped the councilman move into Weathermaster offices at 1000 Ames Avenue in Milpitas in late March 1983.

David Van Nus confirmed his March 7 comments that he had seen Fletcher at several Weathermaster sales meetings in San Jose before early March 1983. But he said he could not be sure that he had seen Fletcher in Fresno.

"It was all my opinion," David Van Nus said. "I saw Claude at meetings in San Jose. I thought I saw him in Fresno. I wasn't planning on remembering every detail."

The timing has become significant because Fletcher resigned from the board of directors of Economic & Social Opportunities Inc., the anti-poverty agency from which Weathermaster sought a contract, on March 9, 1983.

The councilman has said he resigned from the board in time to avoid any conflict of interest arising from his involvement in Weathermaster. Fletcher has said he didn't become a partner in Weathermaster until weeks after he resigned from the ESO board.

Fletcher also has denied other ESO officials' charges that he lobbied them on behalf of Weathermaster while still on the board.

Five ESO officials have said Fletcher, while serving on the board, tried to sway a $1.6 million contract for insulating poor people's homes to Weathermaster.

Fletcher has said that the earliest Weathermaster sales meeting he recalls attending was March 1, 1983, and that he attended that meeting only as a friend, not as a partner.

Neither of the Van Nus brothers called the Mercury News to complain about the March 10, 1984, article in which the were quoted. They were contacted after the newspaper learned that their comments to the district attorney's office differed from their statements to a reporter.

"It was all my opinion. . . . I thought I saw him in Fresno. I wasn't planning on remembering every detail."

— *David Van Nus, salesman*

On Wednesday, Dutch Van Nus said in an interview that his comments were reported erroneously. "That was definitely not what was said there," he said.

Dutch Van Nus insisted that he had been asked only where the Weather-

master salespeople met before they moved their offices to Salinas.

In the March 7 interview, Dutch Van Nus described the Fresno meeting as one of the regular meetings of the Weathermaster sales force. He said Fletcher was not introduced as a partner, but only as "Claude Fletcher, who used to work for us."

The chief executive of the Weathermaster Co. in Milpitas and Salinas was Archie Westfall, who became Claude Fletcher's partner. Their firm was separate from the Weathermaster Co. in Fresno, although both Westfall and Fletcher once worked in the Fresno operation.

David Van Nus told the Mercury News in the March 7, 1983, interview that there was "absolutely no doubt" in his mind that Fletcher was involved in the Weathermaster firm before March 1.

He also said then that Weathermaster salespeople had first heard in December about the low-income contract, which was supposed to begin after Jan. 1.

David Van Nus said that since his comments were reported, he had received phone calls from Fletcher and the district attorney's office.

On Thursday, he said that he had been misquoted and that he had not intended his comments to be publicized.

"I just wish I hadn't gotten involved," David Van Nus said.

Tommy Fulcher Jr., the executive director of ESO, said Fletcher contacted him also. Fulcher said Fletcher tried to persuade him to sign a statement that made it appear that Fulcher had warned the Mercury News that his statements about the case were wrong.

In the March 7 interview, Dutch Van Nus, now a Fresno communications executive, said Westfall still owed him money from his work for Weathermaster. He said this week that no one had pressured him to change his story.

"Nobody's leaning on me at all," he said.

District Attorney Leo Himmelsbach, who has reopened an investigation into Fletcher's business dealings, said there was no legal reason that Fletcher shouldn't talk to potential witnesses in the case.

"I don't think there's any question that he can do it and make his own assessment of what was said," Himmelsbach said. "It's a free country. He can talk to whomever he likes."

Three board members who were quoted in the original Mercury News article on the Fletcher case, Joe Melino, Linda Castaldi and Jo Fields, said Fletcher had not contacted them.

San Jose Mercury News 3/10/84 p. 1A

# Fletcher had earlier link to company, employees say

By Scott Herhold

Staff Writer

FRESNO — San Jose Councilman Claude Fletcher began attending sales meetings of the Weathermaster insulation company in early January 1983, two months before he resigned from an anti-poverty agency board from which the firm sought a contract, according to two former salesmen for the firm.

The statements of the former salesmen, David and Dutch Van Nus, place Fletcher's involvement with the firm substantially earlier than the 45-year-old councilman has acknowledged.

Fletcher has denied any conflict of interest. In a news conference Thursday, the councilman said he had not attended any Weathermaster meetings before March 1.

Asked about the Van Nuses'

## Salesmen link Fletcher to firm in January

Continued from page 1A

he had not attended any Weathermaster meetings before March 1.

Asked about the Van Nuses' statements as he left the conference, Fletcher said, "That's simply not true." He walked away, declining to comment further.

The two Van Nuses, who are brothers, said Fletcher attended a Weathermaster meeting in Fresno shortly after the first of January 1983.

The board of Economic and Social Opportunities Inc. (ESO) did not consider the low-income insulation contract until its Jan. 24, 1983, meeting. But insulation firms throughout the state already were aware that the Public Utilities Commission had approved a program for the free insulation of poor people's homes.

Fletcher has said his financial interest in Weathermaster began only after his resignation from the ESO board on March 9, 1983.

Although acknowledging Thursday that he attended several Weathermaster sales meetings, Fletcher said he went only as a friend of Archie Westfall, a longtime insulation salesman

with whom Fletcher had worked 20 years ago in Fresno.

Of the March 1 meeting, which he said was the first he attended, Fletcher said, "Archie Westfall was a friend of mine, and I attended that meeting observing their operation."

But David Van Nus said he had seen Fletcher at "six or seven" sales meetings in San Jose beginning in late January and continuing through early March. Van Nus said he left the firm March 10 because Westfall's promises to give him a management position went unfulfilled.

Van Nus said Fletcher did not speak a great deal at the meetings, which were held on Tuesdays and Thursdays at the Seasons Restaurant on Monterey Road. He said Fletcher missed some Tuesday-night meetings because of his council sessions.

"One time I said something about Claude being a councilman," David Van Nus remembered. "Archie was very hush-hush about it."

"There's absolutely no doubt in my mind that Claude Fletcher was involved in

Weathermaster before March
1."

*— David Van Nus, salesman for
Weathermaster*

David Van Nus said he believed that
the reason Fletcher and Westfall
formed their partnership was to obtain
the $1.6 million insulation contract
from ESO for low-income homes.

"There's absolutely no doubt in my
mind that Claude Fletcher was in-
volved in Weathermaster before
March 1," said David Van Nus, who
now sells insulation in Fresno.

He first heard of the low-income
project in December, when Westfall
told salesmen that the project would
begin shortly after the first of the year,
Van Nus said.

Westfall could not be reached for
comment Friday.

According to Van Nus' brother,
Dutch, now an account executive for a
Fresno communications firm, the Fres-
no meeting shortly after the first of the
year was one of the regular weekly
meetings of the sales staff on the sec-
ond floor of the Weathermaster-Fresno
offices at 86 E. Olive St.

Dutch Van Nus added, however,
that nothing was mentioned at that
meeting abut Fletcher's becoming a
partner.

"He was just introduced as 'Claude
Fletcher, who used to work for us,' " he
said.

Dutch Van Nus, who worked as a
supervising salesman in Weathermas-
ter's Salinas offices, said he did not see
Fletcher again until the firm moved
into its Milpitas offices in late March.

Ultimately, Weathermaster received
only a tiny portion of the ESO work.
ESO board members, some of whom
said they were angered by Fletcher's
lobbying, decided on March 28 to give
the contract to a consortium of Hispan-
ic bidders.

The Mercury News reported Sunday
that five officials of the agency said
Fletcher, while still on the board, had
tried to sway the $1.6 million contract
to Weathermaster.

Fletcher has denied the allegations,
accusing the newspaper of conducting
a "political vendetta" against him.

The Weathermaster Co. in Fresno
and the Weathermaster Co. in Milpi-
tas, which Fletcher joined as a partner,
are separate companies. The link be-
tween them is Westfall, who was a
manager in the Fresno operation and
who became Fletcher's partner in Mil-
pitas. Weathermaster-Milpitas was
formally incorporated by Fletcher on
April 15, 1983.

ESO's records reflect some confusion
between the two companies. On a
March 23 application to obtain the
ESO contract, Westfall cited the expe-
rience and equipment of the Fresno
firm as reasons why it should receive
the work. The application also used the
contractor's license number of the
Fresno firm.

But the head of Weathermaster-
Fresno, R. Donald Smith, has insisted
that Weathermaster-Fresno and
Weathermaster-Milpitas were com-
pletely separate entities. It was Weath-
ermaster-Milpitas that received autho-
rization for insulating 50 low-income
homes through ESO in October.

The recollection of the Van Nuses
supports the version of two saleswom-
en for Weathermaster, who said they
attended a March 1 sales meeting at
which both Westfall and Fletcher
spoke.

Fletcher has collected statements
disputing the saleswomen's version
that Westfall boasted of Fletcher's be-
ing able to obtain the low-income con-
tract.

Both of the Van Nuses said they had
never been contacted by the Santa
Clara County District Attorney's
Office, which has reopened an investi-
gation into Fletcher's conduct.