Filed 10/24/22  Zeidenfeld v. Stetler CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALVIN ZEIDENFELD, | B308360 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV02079) |
| v. | |
| DAVID STETLER et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING (NO CHANGE IN JUDGMENT) |
| Defendants and Appellants. | |

THE COURT:

The opinion filed October 3, 2022 is modified as follows:

(1)     On page 26, in the last paragraph, the following text is deleted:  "We observe that *Copp* may no longer be persuasive in light of the United States Supreme Court's limitation of *Gertz* in *Milkovich*.  Assuming *Copp* remains viable"

(2)     In the last line on page 26, the first letter of the word "we" is capitalized.

(3)     On page 30, the first sentence in the first full paragraph is deleted.  The following sentence is inserted in its

place: "Defendants' own tweets contain statements which, at this early stage of the proceedings, qualify as direct evidence that may support an inference of recklessness to the truth of the statements."

There is no change in judgment. Appellants' petition for rehearing filed October 18, 2022 is denied.

NOT TO BE PUBLISHED.

_____

ROTHSCHILD, P. J.          BENDIX, J.          KELLEY, J.*

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/3/22  Zeidenfeld v. Stetler CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALVIN ZEIDENFELD, | B308360 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV02079) |
| v. | |
| DAVID STETLER et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Affirmed in part and reversed in part.

Greenberg Traurig, Tyler R. Andrews and Bethany L. Rabe for Defendants and Appellants.

Klapach & Klapach, Joseph S. Klapach; Singh, Singh & Trauben and Thomas K. Richards for Plaintiff and Respondent.

——————————————

"Fantasy sports leagues allow participants to 'manage' virtual teams of professional players in a given sport throughout a sport's season and to compete against other fantasy sports participants based upon the actual performance of those players in key statistical categories. Fantasy sports have become extremely popular in recent years. They have earned a place in modern popular culture and are the subject of countless newspaper and magazine articles, books, internet message boards and water-cooler conversations." (*Humphrey v. Viacom, Inc.* (D.N.J. June 20, 2007, No. 06-2768 (DMC)) [2007 WL 1797648, at p. *1].) This case involves statements made on Twitter about a prominent daily fantasy sports analyst, who describes himself as having the most followers of any daily fantasy sports analyst on Twitch and YouTube.

After plaintiff Alvin Zeidenfeld filed a complaint alleging two counts of per se defamation, defendants David Stetler and Fantasy Cruncher, Inc. (collectively defendants) filed a motion to dismiss pursuant to Code of Civil Procedure section 425.16.[1] Section 425.16, "[f]amiliarily known as the anti-SLAPP statute . . . allows defendants to seek early dismissal of unmeritorious claims arising from protected speech and petitioning activities."[2] (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1004.) Defendants challenge the trial court's order denying their anti-SLAPP motion.

---

[1] Undesignated statutory citations are to the Code of Civil Procedure.

[2] SLAPP stands for "strategic lawsuit against public participation." (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1250, fn. 1 (*Jackson*).)

We apply the required two-step framework in determining whether the trial court's ruling was error. We agree with the trial court's finding as to step one, to wit, that plaintiff's defamation per se claims arise out of protected activity. Specifically, plaintiff's defamation claims arise from speech in a public forum concerning an issue of public interest. (*Clarity Co. Consulting, LLC v. Gabriel* (2022) 77 Cal.App.5th 454, 462.) As to step two—whether plaintiff has established with admissible evidence, a "probability" of prevailing on his claims (Code Civ. Proc., § 425.16, subd. (b)(1)), or as our Supreme Court has summarized prong two, demonstrated that his claims have " ' "minimal merit" ' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884 (*Wilson*))—we conclude plaintiff has satisfied his prong two burden only as to one of his defamation per se claims. The trial court thus erred in denying the anti-SLAPP motion as to both defamation per se claims, and we affirm in part and reverse in part the order denying defendants' anti-SLAPP motion.

## BACKGROUND

Although the parties agree on very little, they appear to agree that plaintiff and defendants are involved in the daily fantasy sports (DFS) world, albeit in different contexts. According to plaintiff, DFS players build teams of professional athletes and compete against each other with scores based on the athletes' performances in real-world competitions. Defendants objected to this statement as unqualified expert testimony, but

3

offered a similar description of DFS.[3]  According to plaintiff, "[i]n the United States, the DFS industry is dominated by two competing services:  the New York-based FanDuel, and the Boston-based DraftKings, each, upon information and belief with an estimated value of at least $15 billion."  (Italics omitted.) Plaintiff stated that DFS prize pools often reach millions of dollars.

Plaintiff describes himself as "a daily fantasy sports analyst and contributor and an online media personality professionally known as 'Smizzle' or 'Smizz.' "  He began working as an analyst in 2013.  Plaintiff represents that currently, he "produce[s] DFS content across multiple platforms, including articles, podcasts, radio shows, and digital video and live television programming."  He provides "advice and commentary on how to win daily fantasy sports . . . ."  Plaintiff boasts 50,000 followers on his Twitter account.  Plaintiff worked at ESPN and DraftKings, and then produced his own content.  When he worked for ESPN, he appeared on a cable show.  According to plaintiff, he has "the largest following/subscribers amongst any DFS content creator" on the streaming services YouTube and Twitch.

Defendant Stetler describes himself and his company defendant, Fantasy Cruncher, Inc., as "well known figures in the often rough-and-tumble world of online daily fantasy sports (DFS)."  According to defendants, they "often engage in jabs, barbs, or 'smack-talking' on social media with others in the DFS industry."  According to defendants, "Fantasy Cruncher, Inc. is a

---

[3] The trial court did not rule on the parties' numerous evidentiary objections and the parties' do not raise them on appeal.

4

popular website and efficiency tool for DFS players." It allows "frequent DFS players to create multiple optimal lineups for use on DFS operator sites . . . ."

## 1. *First amended complaint*

Plaintiff's first amended complaint, the operative pleading, alleges two causes of action. In his first cause of action for defamation per se, plaintiff alleged that using Fantasy Cruncher's account, Stetler posted the following message on Twitter: "I get why you are soooo outraged. How did the lawsuit you had vs. your own wife turn out?" (We refer to this allegedly defamatory statement as the Lawsuit Statement.) The post was in response to plaintiff's following statement: "Any personality or company who works with them after this round of awfulness will have a hard time washing that stink off them for the rest of the time they work in this industry. [¶] Choose your partners wisely." The operative complaint does not identify "them" or "this round of awfulness." According to defendants, Zeidenfeld posted the statement after Fantasy Cruncher's tweet of "somewhat colorful thoughts about another competitor . . . ." Specifically, defendants believed the nonparty "should 'jump[ ] off the Brooklyn bridge.' " In a subsequent tweet, Stetler described his position as follows: "Unpopular opinion: there are too many people in the world. Maybe some SHOULD kill themselves."

In a second cause of action for defamation per se, plaintiff alleged that from Stetler's personal account[4], Stetler posted the following message on Twitter: "Guess not. Which isn't the least

---

[4] No party distinguishes between Stetler's and Fantasy Cruncher's potential liability. We therefore treat the defendants as a collective unit for purposes of this appeal.

bit surprising.  Smizz is a total fraud and this is probably the 10th lie he has told today.  Fucking con man." (We refer to this alleged defamatory statement as the Con Man Statement.)  Although it is not alleged in the operative complaint, according to defendants, Stetler tweeted the above statement after plaintiff tweeted, "Good morning to everyone.  Literally everyone, no exceptions."  According to defendants, Stetler initially responded, "Even me?" and then wrote the challenged tweet underlying this second defamation cause of action.

Plaintiff alleges defendants' statements were false and Stetler knew they were false or acted with reckless disregard as to their truth.  Plaintiff further alleges a reader would understand the Con Man Statement to refer to plaintiff's profession as a daily fantasy sports analyst and commentator.

## 2.  *Anti-SLAPP motion*

Defendants filed a special motion to strike the complaint pursuant to section 425.16.  Defendants argued that their speech is constitutionally protected and plaintiff could not demonstrate a probability of success on either defamation per se cause of action.  Defendants asserted that the public is "undoubtedly interested" in plaintiff.  Defendants stated DFS was experiencing "booming popularity."  According to defendants, their " 'trash talk' about Plaintiff in this type of environment is simply 'rhetorical hyperbole,' not actionable defamation."

In his declaration in support of the anti-SLAPP motion, Stetler averred that "it is very common in the DFS world for players and entities to engage in jabs, barbs, or 'smack-talking' with each other.  People in the DFS community understand this, are used to seeing (if not engaging in) banter and trash-

6

talking . . . ." Stetler believes that "trash-talking" is "not take[n]" "very seriously."

Stetler personally "dislike[s] the type of service and analysis offered by Smizz . . . ." Stetler, however, recognizes that plaintiff has "fans and followers and apparently does well for himself as a media personality and commentator." According to Stetler, he and plaintiff have a "public feud." Stetler claimed he believed that plaintiff was involved in litigation adverse to his wife because he obtained that information from a person who worked with plaintiff's wife. Stetler thought his "obvious . . . insult" that plaintiff was "a total fraud and this is probably the 10th lie he has told today. Fucking con man" was "said in a joking, 'smack-talking' manner." Stetler did not aver that he believed the Con Man Statement was true.

### 3. *Opposition to motion to dismiss*

In opposing the anti-SLAPP motion, plaintiff argued the "statements do not implicate a public issue, contribute nothing to a public debate and, instead, are singularly intended to harm Plaintiff's reputation." Plaintiff further argued that his causes of action do not involve a statement of public interest.

In his supporting declaration, plaintiff contended the challenged Con Man Statement could be understood as undermining his credentials and portraying him as a "career losing player" in the DFS arena. Specifically, according to plaintiff, the import of the challenged Con Man Statement was to cast doubt on his advice and opinions as an analyst and undermine his reputation for integrity. Plaintiff stated that the DFS community would interpret defendants' " 'fraud' " and " 'conman' " statement as bearing on plaintiff's credentials as an analyst. Plaintiff asserted that a DFS reader would understand

the comments to mean that plaintiff engages in acts of fraud and deception. Plaintiff also asserted that the Lawsuit Statement attacked his "integrity and values within the DFS community, specifically with the intent of harming [his] professional reputation." According to plaintiff, neither he nor his wife filed a lawsuit against the other.

Plaintiff elaborated, "[B]y virtue of Stetler, the owner of one of the most prominent DFS optimizing companies in the DFS business, directly accusing me of being a total fraud, conman and prolific liar, the context of Stetler's message is that, contrary to my representations to the DFS community and public, I do not have a winning historical record in DFS and, instead, that I am a career losing player. Stetler's comments, however, are false. Over the course of my career in DFS, I have a winning record and have in fact won far more than I have lost." Plaintiff also contended, "As part of my marketing and promotion as a daily fantasy analyst and online personality who provides advice and commentary on how to win daily fantasy sports, I rely upon my success and accomplishments as a daily sports fantasy player to instill confidence in my audience that I am qualified and competent to provide daily fantasy sports advice."

Plaintiff attached an exhibit of tweets to his declaration. The Lawsuit Statement occurred on November 29, 2019. Also on November 29, 2019, Fantasy Cruncher tweeted, "I've been the outsider in the 'dfs industry' since day 1. This shit doesn't even register a 1 on the scale and the good ol'boy's in the DFS industry can eat dicks. I speak the truth cause I have never taken a dollar from someone in any unethical manner. This is me lookin back." Fantasy Cruncher replied to the string of tweets regarding the Lawsuit Statement, when it tweeted, "Is it really shit talk when

8

it's just telling the truth?? These are the industry things most end users don't hear about. I just dgaf."

Nonparties also responded to defendants' Lawsuit Statement. One person responded, "Well this looks like libel." Another responded, "Im sure there's some truth to your tweet but those of us in the dark want to know wat you mean." Another person responded, "Cmon if you really knew something, you'd be able to back it up." Another tweeted, "I mean Smizz is a trash person and has treated people like trash."

On December 2, 2019, Zeidenfeld tweeted, "Good morning to everyone. Literally everyone, no exceptions. " The same day, defendants responded with the Con Man Statement.

On January 7, 2020, FC_Zach, who plaintiff indicates is "an official Fantasy Cruncher admin account" tweeted, "Anyone who can get sued multiple times by their own wife is someone I don't want to be around." FC_Zach later tweeted, "Yes it's true and I don't know how they are still married." When another user tweeted, "Al said its not true on stream," FC_Zach responded, "He's a lie."

On January 12, 2020, Fantasy Cruncher tweeted, "[Y]ou [plaintiff] are the weirdest dude in all of DFS. But if you want a fucking beat down keep talking." Several nonparties responded to the tweet. Fantasy Cruncher later tweeted, "He filed a lawsuit against me for talking shit to him on twitter. I am being sued for tweets. I cannot make this up." Several nonparties responded to the tweet. Fantasy Cruncher tweeted, "Can't wait for this stupid fucking case to get dismissed so I can really rip into this dumbass @AlZeidenfeld. How anyone agreed to procreate with you is beyond me. Something tells me she regrets it all." Several nonparties responded to the tweet.

9

### 4.     *The trial court denies the anti-SLAPP motion*

After a hearing, the trial court found defendants had met their burden to show that the first amended complaint arises from activity protected by the anti-SLAPP statute, but that plaintiff had made a prima facie showing of prevailing on his two defamation causes of action.  Defendants appealed from the order denying the anti-SLAPP motion.  The denial of an anti-SLAPP motion is immediately appealable.[5]  (*Sandlin v. McLaughlin* (2020) 50 Cal.App.5th 805, 819.)

## DISCUSSION

We review the trial court's order de novo. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)  "A court evaluates an anti-SLAPP motion in two steps.  'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.  [Citations.]  If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.]  If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson*, *supra*, 7 Cal.5th at p. 884.)

---

[5] Defendants incorrectly argue that our review is limited to the second prong of the anti-SLAPP analysis because plaintiff did not cross-appeal from the trial court's order.  A prevailing party is not required to file a cross-appeal to preserve arguments concerning the trial court's reasoning. (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 673, fn. 8.)

10

## A.  Plaintiff's Defamation Claims Involve Written Statements Made in a Public Forum in Connection With an Issue of Public Interest

Included in the anti-SLAPP statute's definition of protected activity is section 425.16, subdivision (e), which provides:  an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes:  (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e); see *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117–1118 [discussing types of statements covered by anti-SLAPP statute].)  Both subdivision (e)(3) and (e)(4) require a showing that a statement be " 'in connection with' an issue of public interest."  (*Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 23 & fn. 5.)

To satisfy the first prong of the anti-SLAPP analysis, defendants rely on subdivision (e)(3), which, as set forth above, provides anti-SLAPP protection to speech in a public forum that is in connection with an issue of public interest.  Although the parties do not dispute that defendants made their statements in

11

a public forum, the parties vigorously dispute whether the statements underlying plaintiff's defamation causes of action were made in connection with an issue of public interest.

The anti-SLAPP statute does not define "public interest." The preamble to the statute counsels that the statute "shall be construed broadly" (§ 425.16, subd. (a)).  Our high court explained in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145–146 (*FilmOn.com Inc.*) that "a statement is made 'in connection with' a public issue when it contributes to—that is, 'participat[es]' in or furthers—some public conversation on the issue," taking into account "considerations of context—including audience, speaker, and purpose." (*FilmOn.com Inc.*, at pp. 151–152.)

*FilmOn.com Inc.* cites favorably *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 and *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133. (*FilmOn.com Inc.*, *supra*, 7 Cal.5th at p. 149.)  *Rivero* identifies the following factors in evaluating whether statements concern a public interest:  The statements concern:  (1) a person or entity "in the public eye"; (2) conduct that "could directly affect a large number of people beyond the direct participants"; or (3) a "topic of widespread, public interest." (*Rivero*, at p. 924.)

*Weinberg* elaborates that public interest for purposes of the anti-SLAPP statute "requires that there be some attributes of the issue which make it one of public, rather than merely private, interest.  A few guiding principles may be derived from decisional authorities.  First, 'public interest' does not equate with mere curiosity.  [Citations.]  Second, a matter of public interest should be something of concern to a substantial number of people.

[Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy. . . .' [Citation.] Finally, 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' [Citation.] A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133; see also *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 [" ' "a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest," ' and . . . ' "[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." ' "].)

Recently, in *Geiser v. Kuhns* (2022) 13 Cal.5th 1238 (*Geiser*), our high court considered whether a demonstration "to protest a real estate company's business practices after the company evicted two long-term residents from their home" implicated a public issue.[6] (*Geiser*, at p. 1243.) Even though the genesis of the protest was an individual family's eviction, about 25 other people protested in an event sponsored by an advocacy

---

[6] The parties provided supplemental briefs addressing *Geiser*'s impact, if any, on this case.

13

organization.  (*Id.* at p. 1244.)  Our high court concluded that the protest concerned an issue of public interest for purposes of the anti-SLAPP statute even if it also involved a matter of private concern to the individual family, who was evicted from the family home.  (*Id.* at p. 1249.)

The Supreme Court reasoned:  "It is common knowledge that foreclosures, evictions, and inadequate housing are major issues in communities throughout California, and the participation of more than two dozen members of an advocacy group dedicated to fighting foreclosures and residential displacement must be considered against that backdrop." (*Geiser, supra*, 13 Cal.5th at p. 1251.)  The high court held that the speech implicated a public issue even though it could also be understood to "implicate a private dispute."  (*Id.* at p. 1253.)

The *Geiser* court also set forth a procedure for evaluating whether an issue is in connection with the public interest.  A court is first tasked with taking the "position of a reasonable, objective observer" to determine if the challenged speech implicates a public issue. (*Geiser, supra*, 13 Cal.5th at p. 1254.) The court must determine "what issue or issues the challenged activity may reasonably be understood to implicate."  (*Ibid.*)  If we determine that the challenged speech implicates a public issue, we must assess whether it furthers a public discussion. (*Id.* at p. 1255.)  Often the two steps overlap.  (*Id.* at p. 1256.)  In making this evaluation, the court is "not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction . . . .' [Citation.]"  (*Id.* at p. 1255.)

Applying the reasonable objective observer test to this case, we conclude that the challenged speech—the Lawsuit and Con

14

Man Statements—implicate a public issue and furthered public discussion. The alleged defamatory per se statements were made in the context of prominent participants in a popular, multibillion dollar industry. The speech occurred on a public forum where plaintiff boasts over 50,000 followers. A reasonable objective observer could conclude that the statements concern plaintiff's integrity as an influencer, with a following of 50,000, in providing services and advice to those persons in the burgeoning fantasy sports world. That defendants' tweets were a matter of concern to a substantial number of people is demonstrated by the tweets of numerous nonparties in response to the challenged statements, with some even requesting additional information. Because the speech was made to a large audience, was of concern to a substantial number of people, and involved the integrity of a person prominent in a multibillion dollar industry, we conclude that the challenged statements were in connection with an issue of public interest within the rubric of the anti-SLAPP statute. (See, e.g., *Friedman v. DirecTV* (S.D.C.D 2015) 262 F.Supp.3d 1000, 1004 [lawsuit alleging idea theft fell within California's anti-SLAPP provisions as being in connection with a public issue or an issue of public interest because of widespread interest in fantasy sports, the millions of fantasy sports fans, and the high worth of the industry]; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 804–805 [speech among radio personalities about person who was contestant on high profile television show was matter in the public interest].)

The size of the audience and the context of plaintiff's and defendants' prominence as influencers in a multibillion dollar industry with a large following distinguish this case from *Du Charme v. International Brotherhood of Electrical Workers*

15

(2003) 110 Cal.App.4th 107, on which plaintiff relies. In *Du Charme*, an employee of a union brought defamation and other claims when he was terminated from his assistant manager position by the defendant union. Plaintiff argued that the statement posted on a union's website informing the union's membership that the plaintiff "had been 'removed from office for financial mismanagement' " was defamatory. (*Id*. at p. 112.) In denying anti-SLAPP protection to that the statement, the appellate court characterized it as "simply informing the local's members of [the plaintiff's] termination," and being "unconnected to any discussion, debate or controversy." (*Id*. at pp. 116, 118.) *Du Charme*'s ongoing controversy requirement "only applies where the issue is not of interest to the public at large." (*Sonoma Media Investments, LLC v. Superior Court* (2019) 34 Cal.App.5th 24, 36; see *id*. at p. 35 [contrasting the posting in *Du Charme* with newspaper articles stating plaintiff real estate developer was the source of his son-in-law's funding of city council campaigns because "[i]t is beyond dispute that elections in general, and the financing of political advertisements in particular, affect large numbers of people and are topics of widespread interest."].) Here, plaintiff's and defendants' undisputed prominence in a multibillion dollar industry with tens of thousands of followers, as well as the undisputed broad interest in defendants' tweets regarding an ongoing feud distinguish this case from the posting of an employee's termination on a union website in *Du Charme*.

We reach the conclusion that defendants' statements were made in connection with an issue of public interest, recognizing that not all speech about a person in the public eye is necessarily in the public interest. For example, in *Albanese v. Menounos*, a

16

celebrity stylist sued for defamation when a television personality accused her of stealing. (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 926.) The appellate court found that the statements concerning the stylist's theft were not made in connection with a public issue. "At best, the evidence in this case shows there is some public interest in [the plaintiff] based on her profession as a celebrity stylist and style expert." (*Id.* at p. 936.) "[T]here is no evidence that the public is interested in this private dispute concerning her alleged theft of unknown items . . . ." (*Ibid.*) Here, in contrast to *Albanese*, there was evidence the fantasy sports public was interested in defendants' statements if only as demonstrated by the responses from participants in that community. (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 139, 143 [in suit alleging defamation and false light invasion of privacy when plaintiffs' names, likenesses, marital relationship, ages, and professions were " 'hijacked' " by writers for a television, the appellate court wrote, "[T]he creation and broadcasting of *CSI* episode 913 is an issue of public interest because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode."].) In further contrast to the stylist in *Albanese*, who only worked for celebrities, here plaintiff portrays himself as an influencer with over 50,000 followers.

## B. Plaintiff Has Demonstrated Minimal Merit Sufficient To Withstand an Anti-SLAPP Motion Only on His Cause of Action Based on the Con Man Statement

As previously noted, at the second step in evaluating an anti-SLAPP motion, the "plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal

17

merit' [citation]."  (*Wilson, supra,* 7 Cal.5th at p. 891.)  "At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." ' [Citations.]"  (*Ibid.*)

### 1.    *General defamation principles*

" ' "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." ' [Citations.]  'In general, . . . a written communication that is false, that is not protected by any privilege, and that exposes a person to contempt or ridicule or certain other reputational injuries, constitutes libel.' [Citation.]"  (*Jackson, supra,* 10 Cal.App.5th at pp. 1259–1260.)  "Libel" is defined as "a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  (Civ. Code, § 45.)

Statements that tend to injure a person directly, and without the need for explanatory matter, are libelous per se. (Civ. Code, § 45a.)[7]  "A statement can also be libelous per se if it

---

[7] Civil Code section 45a provides:  "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous

18

contains a charge by implication from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter.  [Citation.]  However, if the listener would not recognize the defamatory meaning without 'knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons' [citation], the matter . . . requires pleading and proof of special damages." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112.)

A statement must be considered in context to determine if it has a defamatory meaning. (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1338 ["snippets" may not be considered out of context; see also *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696 (*Summit Bank*) [court should consider totality of the circumstances].)  " ' "Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood." ' [Citation.]" (*Reed v. Gallagher* (2016) 248 Cal.App.4th 841, 856 (*Reed*).)

### 2. *The Lawsuit Statement was not libelous per se*

To recap, the Lawsuit Statement was defendants' tweet, "How did the lawsuit you had vs. your own wife turn out?"  We conclude this statement is not defamatory per se.  It does not

___

on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof.  Special damage is defined in Section 48a of this code."

tend to injure a person directly without the need for explanatory matter. (Civ. Code, § 45.) Merely stating involvement in litigation absent more information about the litigation, would not tend to harm a litigant's reputation. It is undisputed that plaintiff did not allege or present evidence of special damages—a necessary element of a purported defamatory statement that is not defamatory per se. Accordingly, plaintiff's failure to establish a probability of prevailing on his claim of defamation per se regarding the Lawsuit Statement fails to pass step two of the anti-SLAPP framework. (See fn.7, *ante*.)

Plaintiff argues that that the Lawsuit Statement shows he "is of such inferior character and so untrustworthy that even his own wife has sued him multiple times." This argument is based on a mischaracterization of the allegations in the operative complaint. The alleged defamatory statement, quoted above, neither references multiple lawsuits nor states plaintiff's wife filed suit. Although defendants in subsequent tweets refer to multiple lawsuits, these tweets are not alleged in the operative pleading as the basis for the defamation causes of action. To repeat, because plaintiff alleges only per se defamation, the alleged statement, on its face, must be defamatory without resort to extrinsic explanatory matter. Because the Lawsuit Statement is not such a statement, the trial court should have stricken the cause of action based on that Statement.

### 3. The Con Man Statement may be understood as relating provable facts that are libelous per se

As set forth above, the Con Man Statement recited, "Smizz is a total fraud and this is probably the 10th lie he has told today. Fucking con man." Defendants argue that the statement was not based on provable facts and instead was mere opinion, which

cannot support a cause of action for defamation. Defendants also argue that the context, which was not alleged in the complaint, shows that the statements are not libelous.

We reject defendants' characterization of the Con Man Statement as lacking in defamatory content because they were published on Twitter and because, according to defendants, it is "a common and accepted practice throughout Twitter, and in particular withing the DFS community" to "lob" "extemporaneous 'jabs.' "

We live increasingly in a world where the marketplace of ideas is on the internet, including social media sites. We are not aware of any California case that has held that merely because "insults" are the purported lingua franca of social media, any such "insults" are automatically immune from defamation scrutiny.[8] We recognize that the Twitter context here is relevant, but it is not dispositive. (*Feld v. Conway* (D. Mass 2014) 16 F.Supp.3d 1, 4 [tweet made as part of "heated Internet debate" could not be understood to state actual facts].) That being said, California courts have recognized that statements on Twitter

---

[8] See Dreibelbis, Note, "*Social Media Defamation: A New Legal Frontier Amid the Internet Wild West*" (2021) 16 Duke J. of Const. L. & Policy 245, 257–258 (Note, *Social Media Defamation*) [observing that "[s]ocial media platforms have become the primary news source for many Americans" and that "[s]ome courts [citing New York as an example] treat social media speech as per se hyperbole, citing to factors like its casual, imprecise language, anonymity, and lack of editorial oversight," while others have applied "traditional defamation principles to social media speech, pointing to the recklessness with which users post statements and the specific knowledge claimed when asserting falsehoods."].)

can be defamatory. (*Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 428–429 [content posted on the internet was reasonably susceptible to interpretation implying a false assertion of fact].) "[T]he mere fact speech is broadcast across the Internet . . . does not ipso facto make it nonactionable opinion and immune from defamation law." (*Id*. at p. 429; see also *Sanders v. Walsh* (2013) 219 Cal.App.4th 855, 864 [online commentators are not immune from defamation liability]; *ZL Technologies, Inc. v. Does 1–7* (2017) 13 Cal.App.5th 603, 629 [online reviews of employer constituted actionable defamation].) Moreover, the statements were not made on a platform alerting the reader that the statements should be viewed with skepticism. (Cf. *Summit Bank, supra*, 206 Cal.App.4th at p. 696 [statements broadcast " 'Rants and Raves' " section of website alerted the reader that those statements should be viewed with skepticism].)

Defendants' efforts to analogize their statements to those made during a heated political campaign are inapt. In *Reed*, *supra*, 248 Cal.App.4th at p. 859, the court emphasized the statement that plaintiff, defendant's rival candidate for the California Assembly, was a crook "was made during the heat of a political campaign, a context in which the audience would naturally anticipate the use of rhetorical hyperbole." (*Ibid.*) Under these circumstances, the *Reed* court held that no reasonable person would have thought the defendant was accusing the plaintiff of actual criminal activity. (*Ibid.*) Similarly, in *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 264–265 (*Rosenaur*), the court found not actionable a statement referring to a political opponent as a " 'thief' " because it would be understood as "hyperbole" and not as a claim that a defendant had a criminal past. The court explained: "As distasteful as such

a charge is, '[o]ur political history reeks of unfair, intemperate, scurrilous and irresponsible charges' [citation] which are nonetheless protected by the First Amendment when no one could reasonably interpret them as a defamatory fact." (*Id.* at p. 265.) Relying on the importance of the political context, *Fletcher v. San Jose Mercury News* (1989) 216 Cal.App.3d 172, 190 held that an alleged defamatory statement that a former San Jose city councilman was a " 'crook and a crooked politician and I don't want him to be reelected' " was mere opinion. (*Id.* at pp. 190–191.)

Defendants also rely on *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 695, which also emphasizes the special context of political speech in evaluating an anti-SLAPP motion. In contrast to other forms of speech, according to *Issa*, "political speech" requires an "extraordinary degree of protection." (*Ibid.*) "While '[i]t is abhorrent that many political campaigns are mean-spirited affairs that shower the voters with invective instead of insight,' in order *'to ensure the preservation of a citizen's right of free expression, we must allow wide latitude.'* [Citation.]" (*Ibid.*) In this context, the court concluded that the statement the politician " '[g]amed the system to line his own pockets' " was not provably false. (*Id.* at pp. 705–706.)

In contrast to *Reed*, *Rosenaur*, *Fletcher*, and *Issa*, the case before us does not involve a political candidate. Instead, it involves an influencer in a prominent online industry in which defendants apparently responded to plaintiff's good-morning greeting with an accusation that plaintiff is a fraud, liar, and con man. Nothing about a good morning greeting or about the online sports industry would allow us to conclude that defendants' accusation is mere rhetorical hyperbole.

23

Defendants argue their Con Man Statement is outside the purview of defamation because the statement constitutes nonactionable opinion. Quoting *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 339–340 (*Gertz*), defendants emphasize: "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." Subsequent to *Gertz*, the United States Supreme Court decided *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1 (*Milkovich*), which, as described below, clarified *Gertz*.

*Milkovich* involved the defamation claim of a high school wrestling coach who testified in administrative proceedings involving an altercation with another team at a home wrestling game. The defendant was the owner of a local newspaper that printed an article stating, among other things, that students attending the wrestling meet learned, " 'If you get in a jam, lie your way out,' " and that any " 'impartial observer, knows in his heart that Milkovich . . . lied [under oath] at the hearing . . . .' " (*Milkovich*, *supra*, 497 U.S. at pp. 4–5.)

In the majority opinion,[9] Chief Justice Rehnquist detailed the evolution of defamation law, by starting with a quote from Act III, scene 3 of Shakespeare's *Othello*, " 'But he that filches from me my good name [¶] Robs me of that which not enriches him, [¶] And makes me poor indeed.' " (*Milkovich*, *supra*, 497 U.S. at p. 12.) The majority then notes the development of the defamation tort and the limitations the United States Supreme Court has imposed on that tort when a public issue is involved or the plaintiff is a public figure. (*Id*. at p. 14). Included

---

[9] Justice Brennan dissented and Justice Marshall joined in the dissent.

24

in that jurisprudential genealogy is the court's discussion of *Gertz*, which tackled a private—as opposed to public—figure's "defamation actions involving statements of public concern." (*Milkovich*, at p. 15.)

The court described the language on which defendants rely as dictum and rejected a reading of *Gertz* that would exempt from defamation scrutiny statements that could be labeled as opinion: *Gertz* was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.' " (*Milkovich*, *supra*, 497 U.S. at p. 18.) In doing so, the majority reasoned, "[E]xpressions of 'opinion' may often imply an assertion of objective fact." (*Ibid*.) As an example, the court posited, "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." (*Id*. at pp. 18–19.) The majority further explained, "[T]he statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.' " (*Id*. at p. 19.)

Applying these principles to the article before it, the majority concluded that the statements in the article could reasonably be interpreted to "imply an assertion that . . . Milkovich perjured himself in a judicial proceeding." (*Milkovich*, *supra*, 497 U.S. at p. 21.) The court contrasted the statements with "loose, figurative, or hyperbolic language which would negate the impression that the writer was seriously maintaining that [Milkovich] committed the crime of perjury," and that "the connotation that petitioner committed perjury is sufficiently

factual to be susceptible of being proved true or false." (*Milkovich*, *supra*, 497 U.S. at p. 21.)

Turning to this case, it is undisputed that plaintiff's business is one of selling his opinions and advice in a multibillion dollar industry that exists almost, if not entirely, on the internet. His currency, if you will, is his integrity. Statements on social media calling him a con man, a liar and a fraud, can, like the purported opinions in *Milkovich*, be reasonably understood by plaintiff's and defendants' followers as accusing plaintiff of corruption, an accusation that is "susceptible of being proved true or false." We agree with defendants when they were discussing prong one that the subject of this appeal contributed to a public conversation because " 'the owner of one of the most prominent DFS optimizing companies in the DFS business' is allegedly accusing a longtime professional DFS analyst with " 'the largest following/subscribers amongst any DFS content creator' of 'being a total fraud, conman, and prolific liar' " and that the statements concerned integrity.

Defendants' reliance on *Copp v. Paxton* (1996) 45 Cal.App.4th 829 is misplaced. Before the court were written statements like defendant had to " 'keep him [the plaintiff] honest. Quite an experience. Quite a challenge[,]' " which the court described as making "no factual imputation of specific dishonest conduct capable of being proved true or false." (*Id*. at pp. 838–839.) The *Copp* court relied on *Gertz*, among other cases, to conclude that these statements were opinions, and as such were "not actionable as a matter of constitutional law." (*Id*. at p. 837.) We observe that *Copp* may no longer be persuasive in light of the United States Supreme Court's limitation of *Gertz* in *Milkovich*. Assuming *Copp* remains viable, we conclude that the

26

Con Man Statement is capable of being proved true or false for the reasons discussed above.

We further conclude that the Con Man Statement may be understood as per se libelous. No additional context is necessary to understand defendants' accusations as having a tendency to injure. The labels "fraud," "con-man," and "liar," go to the heart of plaintiff's reputation for veracity and without anything more, impugn his integrity. There are no specific facts a reader must know to understand the defamatory meaning of calling a person a con man, liar, and fraud. Defendants fault plaintiff for failing to allege additional context, but no such context was necessary to understand the defamatory meaning of the Con Man Statement. Additionally, defendants vouched for the accuracy of the information as well as defendants' inside knowledge of facts tweeting, "Is it really shit talk when it's just telling the truth?? These are the industry things most end users don't hear about. I just dgaf." For Stetler to then follow these statements with the Con Man Statement would thus reasonably be viewed as serious, fact-based attacks on Zeidenfeld's integrity and not hyperbole.

Defendants rely on *Rapaport v. Barstool Sports, Inc.*, (S.D.N.Y. Mar. 29, 2021, No. 18 Civ. 8783 (NRB)) 2021 WL 1178240, an unpublished federal district court case that relies on New York law, a jurisdiction that has been described as treating social media statements as per se hyperbole.[10] In *Rapaport*, the defendant referred to plaintiff as a racist, fraud, hack, wannabe, and liar. (*Id*. at p. *13.) The federal district court found these

---

[10] See Note, *Social Media Defamation*, at p. 258 ("New York courts are at the forefront of treating defamatory social media speech as per se hyperbole or opinion, and they often cite the informal nature of the speech.")

27

statements "represent nothing more than the . . . Defendants' subjective evaluations of [plaintiff] that are incapable of being objectively proven true or false." (*Ibid*.) In reaching this conclusion, *Rapaport*, nonetheless, noted that "calling someone a 'liar' is more capable of being proven true or false" than the other statements made. (*Id*. at p. *14, fn. 17.) In contrast to *Rapaport*, here, as explained, defendants' statements may be reasonably understood accusing plaintiff of corruption, an accusation that is susceptible of being proved true or false.

### 4. *Plaintiffs sufficiently demonstrated actual malice*

As noted earlier in our Discussion, the First Amendment limits damages "a private individual could obtain from a publisher for a libel that involved a matter of public concern." (*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 751 [summarizing *Gertz*].) When the defamatory statements involve a matter of public concern, a plaintiff must show " 'actual malice,' that is, knowledge of falsity or reckless disregard for the truth." (*Dun & Bradstreet, Inc.*, at p. 751.) Actual malice is not the same as ill will but requires at a minimum "reckless disregard as to truth or falsity." (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 509, 511.)

Circumstantial evidence such as "anger and hostility toward the plaintiff [citation], reliance upon sources known to be unreliable [citations], or known to be biased against the plaintiff," and "failure to investigate" may, "in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (See *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 258.) "To support a finding of actual malice, the failure to investigate must fairly be characterized as '

28

"the purposeful avoidance of the truth" ' or the ' "product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges." ' [Citation.]"  (*Rosenaur*, *supra*, 88 Cal.App.4th at p. 277.)

At this stage in the proceedings, in the context of an anti-SLAPP suit motion where plaintiff has little, if any, discovery, the plaintiff "must establish a probability that he or she can produce such clear and convincing evidence" "that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity." (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 700 (*Overstock*).)[11]  " 'Actual malice may be proved by circumstantial or direct evidence.  [Citation.] . . . . [Citation.]' [Citation.]"  (*Overstock*, at p. 709.)  Plaintiff has met this standard.

Although Stetler averred he believed in the truth of the Lawsuit Statement,[12] Stetler never asserted that he believed in the truth of his Con Man Statement.  This supports the inference

_____

[11]  *Overstock* cited *Milkovich* in concluding that "a false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable."  (*Overstock*, *supra*, 151 Cal.App.4th at p. 701.)

[12]  With respect to the Lawsuit Statement, Stetler averred, "I had (and still have) a sincere belief that Smizz has been involved in litigation adverse to his wife.  This was conveyed to me by mutual acquaintance Brian . . . , who is well known in the DFS community (and who has thousands of followers of his own). I considered the information from Brian to be reliable, and I had no reason to doubt it, as he claims to know and have worked with Smizz's wife in the past, and as far as I know, he has no reason to make up a story like that."

that he did not.  Moreover, Stetler himself professed ill-will toward plaintiff when he described a "feud" between them. Stetler further disliked "the type of service and analysis offered by Smizz."  Stetler's description of his comments as "insults," " 'trash talk,' " and "extemporaneous 'jabs' " suggest the statements were made without investigation or reflection and with an indifference to the truth or falsity of the statements. Defendants' only retort to plaintiff's argument that defendants acted with malice is that defendants believe the statements are mere "hyperbolic insults," a characterization we have rejected.

Defendants' own tweets contain statements which, at this early stage of the proceedings, support an inference of recklessness to the truth of the statements.  Defendants tweeted that they wanted to "rip into this dumbass @AlZeidenfeld," that the "good ol'boy's in the DFS industry can eat dicks," and that defendants "just dgaf."  The inference of recklessness to the truth is supported by defendants' description of their tweets as "trash-talking."  Additional discovery may shed more light on the meaning of defendants' tweets and whether they are indicia of recklessness to the truth.

*Manzari v. Associated Newspapers Ltd.* (9th Cir. 2016) 830 F.3d 881, 882–893, which applied California law, is instructive.  *Manzari* involved a newspaper's publication of a photo of the plaintiff juxtaposed next to a headline reading that the porn industry was shut down because a performer tested positive for HIV.  The Ninth Circuit concluded that the juxtaposition of the headline and article showed that the newspaper acted with reckless disregard of " 'whether its words would be interpreted by the average reader as a false statement of fact.' [Citation.]"  (*Id*. at p. 892.)  The newspaper removed

30

contextual information from the photograph prior to publishing it and failed to "include any explanation or disclaimer" indicating that the plaintiff was not the performer who tested positive for HIV. (*Ibid.*) Even though the newspaper employees denied that they intended to make an implication about the plaintiff, the "willful blindness cannot immunize publishers where they act with reckless disregard for the truth or falsity of the implication they are making." (*Id.* at p. 893.)

Similarly, here, the totality of the evidence at this early stage persuades us that plaintiff has shown a sufficient "probability" that he can produce clear and convincing evidence that defendants made the Con Man Statement with knowledge of its falsity or with reckless disregard of truth or falsity. (*Overstock*, *supra*, 151 Cal.App.4th at p. 700.)

**DISPOSITION**

The trial court's order denying the anti-SLAPP motion is affirmed in part and reversed in part. The trial court is directed to enter a new order granting the motion insofar as it seeks to strike the defamation cause of action based on the Lawsuit Statement and denying it insofar as it seeks to strike the defamation cause of action based on the Con Man Statement. The parties shall bear their own costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

KELLEY, J.*

---

    **\*** Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32